**NOT FOR PUBLICATION**

UNITED STATES COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| LL LIQUOR, INC., DBA Lolo Liquor, | No. 15-35777 |
| Plaintiff - Appellant, | D.C. No. 6:15-cv-00071-SEH |
| v. | |
| STATE OF MONTANA; et al., | MEMORANDUM[*] |
| Defendants - Appellees. | |

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, District Judge, Presiding

Argued and Submitted April 6, 2016
Seattle, Washington

Before: HAWKINS, RAWLINSON, and CALLAHAN, Circuit Judges.

LL Liquor, Inc., doing business as LoLo Liquor ("LL"), appeals the denial of

its motion for a preliminary injunction to halt enforcement of Montana's Senate Bill

193 ("SB 193"), on the basis of its claims against the state under the contract clauses

---

[*] This disposition is not appropriate for publication and is not precedent except as provided by Ninth Circuit Rule 36-3.

of the Montana and United States Constitutions.[1]  Alleging the legislation's new formula for calculating the rate at which LL may purchase liquor from the state runs afoul of terms set forth in a contract with the Montana Department of Revenue ("DOR"), LL claims the state unconstitutionally abrogated its contractual responsibilities.  We have jurisdiction and affirm.

In Montana, the state monopolizes liquor distribution.  DOR, under Title 16 of the Montana Code, maintains a liquor warehouse that sells only to so-called "agency franchise" stores, of which LL is one, and sets the prices.  Agency franchises in turn resell liquor both at retail to the general public, and at wholesale to "all-beverage licensees," a category that includes taverns and casinos.

Each of the state's ninety-six franchises has an individual contract—an Agency Franchise Agreement—with DOR specifying the discount, or "commission rate," it receives on its liquor purchases from the state.  Prior to SB 193, this "commission rate" differed for each franchise and was determined via three separate commission rates set partly by statute and partly through negotiation.  Per Montana Code Section

---

[1] Both the Montana and federal constitutions forbid the state legislature from passing any "law impairing the obligation of contracts."  U.S. Const. Art. I, § 10; Montana Const. Art. II, § 31.  These identically-worded clauses represent "interchangeable" protections, and the analysis of claims under each is similar. *See City of Billings v. Cnty. Water Dist.*, 935 P.2d 246, 251 (Mont. 1997) (internal citations omitted).

16-2-101, one of these inputs, the weighted average discount ratio, was based on sales data from fiscal year 1994 (or, for franchises not then open, on 1994 data from similar-sized franchises).

LL's current owners bought LL in 2014. Their predecessor in interest in 2013 entered an Agency Franchise Agreement with DOR ("the Agreement"), to be valid until 2023. LL's commission rate set therein is 16.144%. In other words, per the Agreement, LL is to receive a 16.144% discount on the state's liquor prices, subject to the Agreement's other terms, until 2023.

Section 2 of the Agreement describes how changes to a commission rate may occur, with reference to applicable Montana Code sections:

> This Agreement must be renewed every ten years if the requirements of this Agreement have been satisfactorily performed. Subsequent changes to the law by the legislature may require terms to change in future renewals of the agreement. [Reference: 16-2-101(5)(a) and (8), MCA.]

> During the term of this Agreement, the commission percentage discount rate may be reviewed every three years, as provided by law. [Reference: 16-2-101(6), MCA.][2]

---

[2] Specifically, section 16-2-101(6) provided (prior to SB 193's enactment) that an agency franchise agreement could be reviewed every three years at the request of either party, and the DOR could adjust the rate *if the franchise concurred*. The commission rate could thus only increase by this mechanism (a franchise would not likely agree to lower its commission rate). SB 193 struck this provision from the 2015 version of the statute.

Section 11 of the Agreement provides further that DOR "may amend or modify this Agreement to conform to changes in state or federal laws" and that "*any change required by a change in Montana law shall be effective immediately* upon the effective date of such change in law, notwithstanding the failure of a party to agree in writing to such change . . . ."

The Montana senate passed SB 193 in 2015, effective February 1, 2016, and to be phased in over three years. It in part amends Section 16-2-101 concerning calculation of commission rates. Abolishing the peg to 1994 data, SB 193 instead bases a franchise's commission rate on the franchise's total liquor purchases from the state the previous calendar year. It offers a graduated rate that ranges from a high 16% rate for franchises that purchased not more than $250,000 the prior year, to a low 12.15% rate for purchases totaling over $7 million.

According to its complaint, in 2014, LL purchased $4.8 million worth of liquor from the state. Its SB 193 commission rate after the legislation's full phase-in would be 12.5%, about a 3.6% drop from its Agreement rate. LL estimates the annual net loss from such a change to be $177,000. By contrast, SB 193 will increase the commission rate for the vast majority of the state's franchise liquor stores.

The district court did not abuse its discretion in denying LL's motion on the basis that LL failed to show a likelihood of success on the merits. This court applies

4

a sequential test to contract clause challenges, asking first whether the state law imposes a substantial impairment on a contractual relationship. *Energy Reserves Group, Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 411-12 (1983). If so, the court moves to a second inquiry, considering whether the new law is "reasonable and necessary to serve an important public purpose." *United States Trust v. New Jersey,* 431 U.S. 1, 25 (1977); *Energy Reserves Group*, 459 U.S. at 412. When a state is a party to the contract and its "self-interest is at stake," "complete deference to a legislative assessment of reasonableness and necessity is not appropriate." *United States Trust*, 431 U.S. at 26; *Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1107 (9th Cir. 1999) (a higher level of scrutiny may apply to the assessment of reasonableness where the legislation abrogates a public, rather than a private, obligation).

LL has not demonstrated that the impairment SB 193 imposes is substantial. A substantial impairment "deprives a party of an important right, thwarts performance of an essential term, defeats the expectation of the parties, or alters a financial term." *S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 890 (9th Cir. 2003) (internal citations omitted). Where legislation changes a financial term, analysis should focus on "the importance of the term which is impaired, not the dollar amount." *Id.* at 892.

Despite LL's proclaimed heavy reliance on the contracted-for commission rate, SB 193 does not alter LL's arrangement with the state beyond reasonable expectation. Section 11 of the Agreement provides for precisely the circumstance at hand—a change in Montana law—and dictates that such a change shall be effective immediately, irrespective of the parties' consent or prior agreement. While this type of clause does not automatically end the dispute in the government's favor,[3] it does speak to LL's awareness of the heavily-regulated landscape against which it contracted. *See Energy Reserves Group*, 459 U.S. at 416 (concluding there was no substantial impairment in part because such a clause "suggest[ed] [the plaintiff] knew its contractual rights were subject to alteration by state price regulation," as "price regulation existed and was foreseeable as the type of law that would alter contract obligations").

LL's attempt to liken its expectations to those of the plaintiff in *Southern California Gas Company* is to no avail. The legislation at issue in *Southern California Gas Company* fundamentally altered the nature of the gas company's transactions with the City of Santa Ana, a change far more significant than the new

---

[3] *See S. Cal. Gas Co.*, 336 F.3d at 892-93 (finding that a term allowing the city to change its ordinance could not be construed to "enable Santa Ana to adopt ordinances that compromise [the contract's] material terms," for to read the clause so "broadly and retrospectively" in that context would be "absurd").

commission rate computation method that SB 193 imposes.  *See S. Cal. Gas Co.*, 336 F.3d at 891-93 & n.5 (for instance, the ordinance required the gas company to purchase a permit to act where it previously had a contractual right to do so).  Because there is no substantial impairment, we need not reach whether SB 193 is reasonable and necessary for a legitimate government purpose.

Finally, should LL ultimately prevail on the merits, its damages are easily calculable.  A preliminary injunction is thus unwarranted here.

**AFFIRMED**