Partial Concurrence and Partial Dissent by Judge N.R. SMITH
OPINION
O’SCANNLAIN, Circuit Judge:
We must decide whether the City of Prescott, Arizona violated the Contract *946 Clause of the Constitution when it declared that its sewage treatment plant would no longer accept wastewater discharged by one of its customers, a large metal refinishing plant.
I
This dispute sees the City of Prescott at odds with Pure Wafer, Inc., a corporate resident of Prescott, over contract interpretation. Pure Wafer’s grievances run from the constitutional — the City has violated our nation’s fundamental charter — to the mundane — the City has betrayed specific promises the two made to each other during happier days.
A
Pure Wafer runs a facility in Prescott for cleaning silicon wafers used by clients like IBM, Intel, and Motorola. Called “test and monitor wafers,” they play a crucial role in the production processes those companies employ to build microprocessors and computer chips. Pure Wafer performs what is called a “reclaim” service: its role is to remove oxide nitrites from the wafers after they pass through a given phase of the production process, clean them, polish them, and send them back to its clients so they can be reused later on. The wafers range in diameter from four inches to one foot.
Pure Wafer does a large volume of business, running the 36,000-square-foot Prescott facility twenty-four hours a day, seven days a week, at around ninety-five percent capacity. All that reclamation activity generates a lot of wastewater — up to 195,000 gallons per day, although in practice it has been less — which Pure Wafer then discharges into the City’s sewer lines. The sewer lines carry Pure Wafer’s effluent into the City’s Airport Water Reclamation Facility (“AWRF”), one of three City-owned wastewater treatment plants in Prescott that process and treat effluent from the City’s sewers. The AWRF then discharges treated effluent either to golf courses or into recharge basins to replenish the City’s aquifer.
This controversy centers on the fluoride concentration in Pure Wafer’s effluent, and the City’s recent enactment of an Ordinance imposing limits on such concentration.
B
In 1997 the City entered into a contract, called the Development Agreement (“the Agreement”), with Pure Wafer’s predecessor in interest, a company called Exsil. In 2007 Pure Wafer purchased Exsil and acquired all of its rights and obligations under the Agreement. Like the parties, we refer to both entities as “Pure Wafer” for simplicity’s sake.
At the time of the Agreement, Pure Wafer owned plants in Sulphur, Oklahoma and San Jose, California. The Agreement was a way for the City to entice Pure Wafer to build its third facility in the Prescott Airpark, which the City expected would create jobs, stimulate economic activity, spur infrastructure improvements, and generate tax revenue. In exchange, the City agreed to provide Pure Wafer with the sewage infrastructure it needed to conduct its reclamation business, plus (among other things) tax and zoning breaks to make it easier for Pure Wafer to expand the facility if it so desired. Pure Wafer constructed the facility in 1997, and expanded it in 2002, at a total cost of roughly $35 million.
C
Three provisions of the Agreement have figured centrally in the parties’ arguments during the course of this litigation.
*947 First, the Agreement’s section 4.2, together with Exhibit F, provide that the City may not raise Pure Wafer’s “sewer usage fees” above a certain rate schedule, so long as the fluoride content in Pure Wafer’s effluent remains at or below 100 mg/L. Exhibit F recites that Pure Wafer’s fluoride content has a “typical” value of 50 mg/L and a “maximum” of 100 mg/L. In addition, Section 4.2 obligates the City to provide up to 195,000 gallons of “sewer capacity” per day, and to bear the cost of “augment[ing] such facilities” as necessary to “accept or accommodate” Pure Wafer’s effluent.
Second, section 9.1 provides that Pure Wafer “will operate the Facility ... in accordance with all local, state, and federal environmental regulations.”
Third, section 14.7, an integration clause, states that “[t]his Agreement and the exhibits hereto constitute the entire agreement between the parties,” “su-persed[ing]” “all prior and contemporaneous agreements, representations, negotiations and understandings.”
D
Pure Wafer insists that when it negotiated the Agreement with the City, its most important objective was to make sure that its ability to operate the facility would not be thwarted by future changes in City regulations. As Pure Wafer tells it, it “didn’t want to ... build a plant that could be ... rendered useless at any time by the City,” and so it took precautions “to make sure that it had a locked up contract and a position on water, sewer and effluent requirements.” To that end, Pure Wafer claims that it “made sure that the City was fully aware of what [the facility’s] requirements were.”
In particular, Pure Wafer avers that it was anxious to safeguard its ability to discharge effluent containing up to 100 mg/L of fluoride, and Pure Wafer maintains that the City represented that discharging fluoride up to that level “would be acceptable.” In fact, earlier in the negotiations Pure Wafer had informed the City that its fluoride levels sometimes ran as high as 150 mg/L, but at the City’s request, Pure Wafer agreed to design the Prescott facility so that its fluoride contents would not exceed 100 mg/L, a commitment reflected in the maximum fluoride value listed in the Agreement’s Exhibit F. In all the years it has run the Prescott facility, Pure Wafer’s discharges have never exceeded 100 mg/L in fluoride concentration, and have averaged about 40 mg/L.
Pure Wafer’s representatives testified that the company’s concern over the prospect of fluoride regulation stemmed in part from its experience in San Jose, where it ran a reclamation facility prior to opening the one in Prescott. In the 1980s San Jose apparently passed an ordinance “similar” to the Prescott Ordinance at issue in this case, which required Pure Wafer to “put a lot of infrastructure in to deal with fluorides,” the cost of which prevented Pure Wafer from expanding the facility. The real problem, Pure Wafer explains, was that it had no Development Agreement with San Jose; so much the wiser, Pure Wafer continues, it took steps to “communicate[ ] [its] needs to the City of Prescott and ... actually got it inputted into a Development Agreement, the contractual obligation.”
For its part, the City also claims that it harbored concerns about effluent composition in general and fluoride levels in particular. As noted above, the City had balked at Pure Wafer’s initial report that its fluoride levels were sometimes as high as 150 mg/L. In addition, at public hearings prior to the Agreement’s adoption, City officials stated that- Pure Wafer would be required *948 to comply with City codes regarding pretreatment of effluent discharge. At that same meeting, a Pure Wafer representative reassured the public that the company “did not want to pollute the air, water and ground, [and] that a system would be designed that would allow discharge from their plant to be pure enough to go into the city’s wastewater treatment plant.”
E
Subsequent changes in state and federal environmental regulations set off the chain of events leading to this litigation. Above all, in 1999 the Arizona Department of Environmental Quality (“ADEQ”) — the State’s environmental regulatory agency— required the City to obtain an Aquifer Protection Permit (“APP”), which, in turn, imposed a host of requirements on the City, including the requirement that any discharge exiting the City’s AWRF could no longer exceed 4.0 mg/L of fluoride, measured at the point of discharge from the AWRF.
That was a big change. Prior to the ADEQ-imposed APP regime, the City operated the AWRF pursuant to a Groundwater Protection Permit, which only required the City to sample the groundwater monitoring wells in the recharge basins in the City’s aquifer, one or more steps downstream from the AWRF’s point of discharge. Under the Groundwater Protection Permit, the fluoride concentration in the recharge basins could not exceed 4.0 mg/L. The important point is that the impact of Pure Wafer’s effluent on samples taken from the recharge basins is less pronounced than it is with respect to samples taken at the AWRF, for at least two reasons. First, the recharge basins take in effluent discharged from at least two different sources: not only from the AWRF, but also from the larger Sundog Wastewa-ter Treatment Plant. The AWRF’s effluent has a higher fluoride concentration than Sun Dog’s, but the two streams of effluent are commingled in the recharge basins, diluting the relative importance of the AWRF’s fluoride levels. Second, some effluent leaving the AWRF is used to water golf courses and does not actually enter the recharge basins. Illustrating the combined importance of these circumstances, it appears that Pure Wafer’s effluent has basically had no effect on the fluoride concentration in the aquifer, as from 1997 through 2013, the monitoring well readings consistently reported fluoride concentrations of less than 0.4 mg/L, or one tenth of the amount allowed under the Groundwater Protection Permit.
ADEQ’s decision to shift the monitoring location to the AWRF’s point of discharge had serious consequences. In particular, the City represents that the AWRF, “like most publically owned treatment works, is not designed to remove fluoride and other types of industrial pollutants” from the wastewater that flows into it, and that, in turn, it sends along to the aquifer. The upshot is that, in order for the City to comply with the APP’s 4.0 mg/L fluoride limit at the AWRF’s point of discharge, one of two changes had to occur: either the AWRF must be equipped to remove fluoride from wastewater that enters it; or the fluoride content of wastewater must be reduced before it ever enters the AWRF. The latter option is known as “pretreatment.”
F
In 2004 ADEQ sent the City a Notice of Violation alleging seven dates during the previous year on which the AWRF’s fluoride levels exceeded the maximum allowed under the City’s APP. The Notice directed the City to “submit a written response describing the corrective actions that have been taken to resolve the violations.” In *949 response, the City in 2005 began to develop a pretreatment program and to explore what local fluoride limits would help ensure that the City complied with its APP.
Nevertheless, when ADEQ conducted a “pretreatment compliance audit” of the City in 2007, it concluded that “[t]he City does not have valid control mechanisms in place to regulate the discharges” from the City’s two categorical industrial users, including Pure Wafer. ADEQ declared it “imperative” that the City “establish an approved pretreatment program.” Under state law, the City’s APP violations could result in ADEQ fining the City up to $25,000 per day. A.R.S. § 49-262(C).
In 2012 ADEQ issued another Notice of Violation to the City, which still had not established a pretreatment program. The basis of the violation was again excessive fluoride concentration in effluent discharged from the AWRF. This time the City and ADEQ entered into a Consent Order, which mandated that within thirty days the City “shall adopt and submit for ADEQ’s review and approval the PreTreatment Program.”
G
In due course, the City passed Ordinance No. 4856-1313 in 2013.[1] As relevant here, the Ordinance imposes limits on the pollutants that industrial users, like Pure Wafer, are permitted to discharge into the City’s sewer system. Most important for this case, the Ordinance declares that Significant Industrial Users (of which Pure Wafer is one) “shall not discharge or cause to be discharged at any entry point” to a publically owned treatment works, including the AWRF, “any wastewater containing in excess of’ 16.3 mg/L of fluoride.[2] The Ordinance also requires industrial users like Pure Wafer to get a permit from the City and, to the extent necessary, to “pretreat” their wastewater prior to discharge — that is, to ensure, at their own expense, that their wastewater complies with the 16.3 mg/L limit on fluoride concentration. The Ordinance threatens those who violate it with injunctive action, civil penalties, and criminal prosecution. ADEQ approved the City’s pretreatment program as established by the Ordinance.
The City estimates that if it were required to pretreat wastewater entering the AWRF so that it complies with the APP’s fluoride limitations, it would cost the City $2.7 million in capital outlay and $8.5 million annually. Pure Wafer has not yet conducted a study, but its preliminary estimate suggested that pretreatment of its own effluent would require the company to spend $1 million to $4 million in capital outlay and $360,000 to $720,000 annually.
H
Not surprisingly, Pure Wafer was not pleased with such developments. Claiming that it will likely close the facility if forced to comply with the Ordinance, Pure Wafer brought this lawsuit against the City (and certain of its officers in their official capacities) under 42 U.S.C. § 1983, seeking declaratory and injunctive relief, or in the alternative, damages. Pure Wafer alleged that by enacting the Ordinance the City had “impaired] the obligation” of its contract with Pure Wafer, in violation of Article I, section 10 of the federal Constitution, *950 as well-as the analogous Contract Clause of the Arizona Constitution; and that the City, by enacting the Ordinance, had committed at least two different breaches of contract, as well as a breach of the implied covenant of good faith and fair dealing. The City counterclaimed for a declaratory judgment that the Agreement in fact obligated Pure Wafer to comply with the Ordinance.
1
The district court held a hearing on Pure Wafer’s motion for a preliminary injunction, which by consent of the parties the court converted into a trial on the merits, to be bifurcated into a liability phase and a damages phase. The parties also agreed that the City would not enforce the Ordinance against Pure Wafer during the pendency of this litigation, including any appeal.
2
After trial on the merits, the district court entered judgment for Pure Wafer, refusing to accept the City’s contention that the pretreatment ordinance is an environmental regulation of the sort Pure Wafer agreed to obey. Instead, believing the Ordinance to be a thinly veiled “cost-shifting regulation,” the district court held that the City, through the Ordinance, had impaired the obligation of its contract with Pure Wafer, in violation of the Contract Clauses of the federal and state constitutions.[3] The district court awarded Pure Wafer a permanent injunction. The court declined to rule on Pure Wafer’s alterna-five claims for breach of contract and breach of the implied covenant of good faith and fair dealing, and deemed it unnecessary to proceed to the damages phase of the trial. In addition, the district court held that Pure Wafer was entitled to attorneys’ fees, but did not set an amount until several months later. The court denied the City’s counterclaim.
3
The City timely appealed the district court’s judgment. The district court had jurisdiction under 28 U.S.C. §§ 1331, 1343, and 1367,[4] and we have jurisdiction under 28 U.S.C. § 1291.
II
The City first argues that the district court erred in holding that the City, by enacting the Ordinance, had violated the Contract Clause. The Contract Clause of the Constitution declares that “No State shall ... pass any ... Law impairing the Obligation of Contracts.” U.S. Const, art. I, § 10, cl. 1. The Contract Clause applies to contracts entered into by a State, Fletcher v. Peck, 10 U.S. (6 Cranch) 87, 135-39, 3 L.Ed. 162 (1810), as well as by municipalities, and such contracts may be “impaired” within the meaning of the Clause by municipal ordinances as well as by state legislation, St. Paul Gaslight Co. v. City of St. Paul, 181 U.S, 142, 148, 21 S.Ct. 575, 45 L.Ed. 788 (1901).
In order to decide whether the City can prevail over the district court’s judgment *951 under the Contract Clause, it is necessary first to set forth the differences between a city or State’s breach of a contract, on the one hand, and a city or State’s impairment of such contract’s obligation, on the other.
A
The Agreement is a contract between a municipality and a private party. In disputes involving government contracts, it can sometimes be hard to tell whether the governmental entity has “impaired the obligation” of its contract or has simply breached its contract with the private party. But the distinction is crucial, not least because conflating the two concepts would risk making a federal constitutional case out of even the most garden variety public contract dispute, transforming the Contract Clause into a font of state contract law. See Horwitz-Matthews, Inc. v. City of Chicago, 78 F.3d 1248,1250 (7th Cir. 1996) (“It would be absurd to turn every breach of contract by a state or municipality into a violation of the federal Constitution.”). In fact, the Supreme Court long ago rejected “the proposition that wherever it is asserted on the one hand that a municipality is bound by a contract to perform a particular act and the municipality denies that it is liable under the contract to do so, thereby an impairment of the obligations of the contract arises in violation of the Constitution of the United States.” St. Paul Gaslight Co., 181 U.S. at 149, 21 S.Ct. 575. Such proposition, the Court explained, “amounts only to the contention that every case involving a controversy concerning a municipal contract is one of Federal cognizance, determinable ultimately in this court. Thus, to reduce the proposition to its ultimate conception is to demonstrate its error.” Id.
So how do we tell the difference between a government’s impairing the obligation of its contract and simply breaching it? At the most basic level, it cannot be said to have “impaired” the obligation of its contract if such “obligation” remains in full force and effect. And our cases establish that the “obligation” of a contract is the judicially enforceable duty it imposes upon each party either to perform or else to submit to the courts’ remedial powers, which will often take the form of an order to pay damages, but may encompass other remedies as well (and thus Holmes may have been too hasty in proclaiming that “[t]he duty to keep a contract at common law means a prediction that you must pay damages if you do not keep it, — and nothing else.” Oliver Wendell Holmes, Jr., The Path of the Law, 10 Harv. L. Rev. 457, 462 (1897)).
Given that principle, state action cannot be said to “impair” the obligation of a contract so long as it leaves both parties free to obtain a court-ordered remedy (typically damages) in the event that either of them fails to perform as promised. And that principle holds true whether state action affects a contract between private parties or, as here, a contract to which the State itself is a party. See, e.g., Univ. of Haw. Prof'l Assembly v. Cayetano, 183 F.3d 1096, 1102 (9th Cir. 1999) (“[T]he substantial impairment test turns on whether the State has used its law-making powers not merely to breach its contractual obligations, but to create a defense to the breach that prevents the recovery of damages.”); Crosby, 635 F.3d at 642 n.7 (“If the offended party retains the right to recover damages for the breach, the Contracts Clause is not implicated; if, on the other hand, the repudiation goes so far as to extinguish the state’s duty to pay damages, it may be said to have impaired the obligation of contract.”); Horwitz-Matthews, 78 F.3d at 1251 (“The essence ... of a breach of contract is that it triggers a duty to pay damages for the reasonably *952 foreseeable consequences of the breach. If the duty is unimpaired, the obligation of the contract cannot be said to have been impaired.”).
The Supreme Court’s Contract Clause cases likewise reflect the deep connection between obligation and remedy, the upshot being that a State does not “impair the obligation” of a contract so long as it leaves contracting parties free to pursue the ordinary state-law remedies in the event of breach. As the Court explained in General Motors Corp. v. Romein, “[t]he obligation of a contract con sists in its binding force on the party who makes it.” 503 U.S. 181, 189, 112 S.Ct. 1105, 117 L.Ed.2d 328 (1992) (quoting McCracken v. Hayward, 43 U.S. (2 How.) 608, 612, 11 L.Ed. 397 (1844)). Thus, a State may “trigger Contract Clause scrutiny” if it enacts “changes in the laws that make a contract legally enforceable,” for example, by eroding “the remedies available under a contract” in a way that “converts] an agreement enforceable at law into a mere promise.” Id. But by contrast, a State does not violate the Contract Clause if its challenged action does “not change the legal enforceability of the ... contracts,” id. at 190, 112 S.Ct. 1105, a condition a State satisfies so long as it does not purport to relieve a party — including, most especially, itself — of its duty either to perform or to submit to a court-ordered remedy.[5]
In a similar vein, United States Trust Co. of New York v. New Jersey explained that “[cjontract rights are a form of property and as such may be taken for a public purpose provided that just compensation is paid,” and thus “[t]he States remain free to ... abrogate such contractual rights, upon payment of just compensation.” 431 U.S. 1, 19 n.16, 29 n.27, 97 S.Ct. 1505 52 L.Ed.2d 92 (1977).
B
In light of the principles 0\⅛⅞⅛ above, it is clear to us that the City has ⅞⅛ impaired the obligation of its contract with Pure Wafer, because the Ordinance has not altered the ordinary state-law remedies to which Pure Wafer would otherwise be entitled if it successfully proves a breach of contract. The City might very well have breached its contract — a question we discuss later in this opinion — but that does not necessarily mean it has violated the Contract Clause of the federal Constitution.
Indeed, Pure Wafer included a claim for simple breach of contract in its suit against the City, alleging that “Pure Wafer cannot comply with the Ordinance without incurring substantial costs which the Development Agreement allocated to the City,” and specifically requested “such amount of damages as Pure Wafer may establish at any trial of this action as flowing from the City’s breach.”
Crucially for our purposes here, the City has never asserted the Ordinance as a defense that would have the legal effect of discharging the City’s duty to perform and would thereby relieve the City of its legal *953 obligation — established by the contract— to pay damages or some other remedy as a consequence of its non-performance.[6]
But we need not speculate about what legal effect the Ordinance might have on Pure Wafer’s entitlement to judicial remedies, because the City has by now several times expressly represented that the Ordinance does not operate to dissolve (that is, impair) its binding obligation to perform whatever it promised to do under the Development Agreement. For instance, as the City put it in briefing following the district court’s hearing on Pure Wafer’s motion for a preliminary injunction:
Pure Wafer ... is suing the City in this case for breach of contract and is seeking money damages_The City is defending this claim based upon the plain terms of the Development Agreement. If Pure Wafer prevails upon its breach of contract claims, the Court will presumably assess damages, to the extent damages are proven and appropriate. In any event, the Pretreatment Ordinance would not frustrate recovery.
Likewise, at the hearing on Pure Wafer’s motion for a preliminary injunction, the City represented that “[t]his is a contract dispute as to what the Development Agreement between plaintiff and the city defendant provides— It’s a garden-variety contract dispute.... They’re seeking damages for [the City’s] alleged breach of the contract— They’re asking for damages if they have to comply because of the breach of contract— The City can respond in money damages if it loses this case at the end of the day.”[7]
Although the City has argued that the Ordinance survives Contract Clause scrutiny because any impairment was not substantial, the thrust of that argument was contract based, i.e. that Pure Wafer “agreed to comply with environmental regulations,” and that the “cost of regulatory compliance [was] not a term that was bargained for.” To the extent the City’s argument could be read otherwise, it should go without saying that the City is barred from altering its position on the legal effect of the Ordinance at subsequent stages in this litigation, thanks to the doctrine of judicial estoppel and related principles. See Whaley v. Belleque, 520 F.3d 997, 1002 (9th Cir. 2008); State v. Towery, 186 Ariz. 168, 920 P.2d 290, 304 (1996) (in banc).
C
The City’s analysis persuades us that Pure Wafer does not have a claim under the Contract Clause. This case has all the hallmarks of a quintessential contract dispute, and insofar as the City has attempted to refute Pure Wafer’s claimed rights under the Agreement — but has not attempted to render such rights legally unenforceable — it should be treated as a contract dispute. The district court’s judgment in favor of Pure Wafer’s Contract Clause claim cannot stand.
Ill
Nevertheless, Pure Wafer seeks to protect the judgment in its favor on the alter *954 native claim that the City has simply breached the contractual obligations it undertook in the Development Agreement. Although the district court did not rule on this claim outright, it discussed the Agreement at length, considered extensive trial testimony, and made sufficient findings of fact and conclusions of law for us to resolve the scope of the parties’ contractual rights without need for a remand.[8]
We therefore proceed to the merits,[9] mindful that with respect to any factual findings, “[i]f the district court’s account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently.” Anderson v. City of Bessemer, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985).
A
The Development Agreement specifies that it “shall be governed by and construed under the laws of the State of Arizona.” The Arizona Supreme Court has made clear that “in Arizona, a court will attempt to enforce a contract according to the parties’ intent.” Taylor v. State Farm Mut. Auto. Ins., 175 Ariz. 148, 854 P.2d 1134, 1138 (1993) (in banc). Moreover, under Arizona law, “a court may consider surrounding circumstances, including negotiation, prior understandings, and subsequent conduct.” Id. at 1139. Further, courts applying Arizona contract law are not required to find ambiguity in the contractual language before they may entertain extrinsic evidence bearing on the parties’ intents. Id. at 1140. Rather, we are instructed “first [to] considerf ] the offered *955 evidence and, if [we] find[] that the contract language is ‘reasonably susceptible’ to the interpretation asserted by its proponent, the evidence is admissible to determine the meaning intended by the parties.” Id. Such practice is permissible so long as the evidence “is being offered to explain what the parties truly may have intended.” Id.
B
Pure Wafer’s theory is that the City promised to accept its effluent so long as its non-pretreated fluoride content remains at or below 100 mg/L, and to bear the financial risk of any future occurrence that would prevent the City from doing so, including future changes in law.[10] To Pure Wafer’s mind, the Agreement gave it a “contractual ... right to discharge at [contractually specified] rates up to 195,000 gallons per day of effluent containing up to 100 mg/L of fluoride,” and what is more, “[t]he parties agreed that ... if it became necessary to modify the sewer system so as to permit Pure Wafer to discharge [such] effluent, the City would pay for that modification cost.” In Pure Wafer’s view, ADEQ’s inauguration of the APP regime has made it “necessary to modify the sewer system” in order to ensure Pure Wafer’s ability to discharge its effluent in the manner it believes the Agreement protects — and, Pure Wafer continues, recent regulatory changes are among the future contingencies whose risk the City agreed to shoulder. In other words, Pure Wafer believes it struck a bargain with the City which “allocated to the City the risk of potential future consequences of its acceptance of ... Pure Wafer’s effluent,” including the risk that later-enacted legislation or regulation would require the City to pretreat such effluent as a condition of continuing to accept it.
Pure Wafer effectively describes the Agreement as a so-called “regulatory contract,” in which a “regulated entity contractually promises the government that [it] will provide or do something that is not otherwise clearly required by extant law. In return, the government contractually promises the regulated entity to maintain the regulatory regime set out in the contract. If the government breaches its promise of regulatory stability, it must pay contract damages.” David Dana & Susan P. Koniak, Bargaining in the Shadow of Democracy, 148 U. Pa. L. Rev. 473, 475 (1999).
Such contracts are hardly novel. To take one prominent example, United States v. Winstar Corp. involved contracts between the federal government and certain thrift institutions, and the Supreme Court held that in such contracts the government had promised to regulate the thrifts in a specific manner, and to pay them damages if it later changed the regulatory landscape in a way that caused them financial harm. 518 U.S. 839, 871, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (plurality opinion) (“The thrifts do not claim that the [federal government] purported to bind Congress to ossify the *956 law in conformity to the contracts.... They simply claim that the Government assumed the risk that subsequent changes in the law might prevent it from performing, and agreed to pay damages in the event that such failure to perform caused financial injury.”); id. at 887, 116 S.Ct. 2432 (“[T]he Government agreed to ... indemnify its contracting partners against financial losses arising from regulatory change.”); id. at 916,116 S.Ct. 2432 (Breyer, J., concurring) (explaining that the class of contract at issue amounts to “a promise that obliges the government to hold a party harmless from a change in the law that the government remains free to make”); id. at 918, 116 S.Ct. 2432 (“The thrifts demonstrate that specific promises were made to accord them particular regulatory treatment for a period of years, which, when abrogated by subsequent legislation, rendered the Government liable for breach of contract.”); id. at 923-24, 116 S.Ct. 2432 (Scalia, J., concurring in the judgment) (“[I]t is clear from the contract in question that the Government ... had assumed the risk of a change in its laws.”).[11] As Justice Souter explained, “[c]ontracts like this are especially appropriate in the world of regulated industries, where the risk that legal change will prevent the bargained-for performance is always lurking in the shadows.” Id. at 869, 116 S.Ct. 2432 (plurality opinion).[12]
The contacts at issue in Winstar operated in the same manner as Pure Wafer alleges the Development Agreement operates here. That is, Pure Wafer claims that the Agreement requires the City to give it the benefit of (among other things) whatever fluoride regulations were in force at the time the Agreement was entered into, and that insofar as newly enacted laws (including the Ordinance) frustrate the City’s ability to do so, the City is in breach of the Agreement and must submit to whatever remedy the court deems appropriate.
C
The district court’s findings amply support Pure Wafer’s position. As the district court recounted, “Pure Wafer presented undisputed evidence that its operations require the discharge of effluent with a fluoride concentration above 16.3 mg/L, that it expected at the time of the Agreement to be able to discharge at concentrations of up to 100 mg/L, that this right was critical to its negotiations based on its past experiences with its San Jose facility, and that the financial viability of the Prescott facility is threatened if it must bear the pretreatment costs.” Likewise, the district court concluded that “Pure Wafer was willing to incur the substantial initial capital investment to construct a reclaim facility in Prescott only if the City agreed to commit to maintaining water and sewer services to the facility at the specifications Pure Wafer needed to productively operate its facility,” and that “Pure Wafer need only establish that it has the right to dis *957 charge at least 100 mg/L, which it has done.”
Although the district court did not use the phrase “regulatory contract” as we did above, the district court’s findings make unmistakably clear that the parties created such a contract. As the district court put it, the City cannot “force Pure Wafer to pay for pretreatment when the City has contractually agreed to not pass along such costs. The City must accept Pure Wafer’s effluent as-is and pretreat it at the City’s own expense.”
We agree with the district court that the City agreed to accept such effluent as the parties knew Pure Wafer would need to discharge in order to maintain a viable business, and that the City agreed to bear the financial risk that State-initiated regulatory changes would make complying with such promise more costly than it was when the parties entered into the Agreement.[13] Hence, the City may not force Pure Wafer to absorb the costs needed to bring the City into line with the terms of its APP. Enforcing the Ordinance against Pure Wafer would eviscerate the benefit of Pure Wafer’s bargain; the City cannot do so without putting itself in breach of the Agreement.
Our conclusion is bolstered by representations the City itself made in a letter to ADEQ in the summer of 2004, in which the City explained that it had “signed an agreement with [Pure Wafer] on 2/11/97 allowing them to discharge Fluoride between 50 mg/1 and 100 mg/1” into the City’s AWRF. And our conclusion derives further support from the district court’s finding that “[a]s early as 1994, ADEQ informed the City that its Groundwater Quality Protection Permit would no longer be sufficient for the operation of the AWRF,” and that, consequently, the City was “[c]learly ... aware at the time it entered into the Agreement that there existed some level of fluoride concentration that would require treatment prior to its ultimate discharge,” but had “inaccurately estimated the particular fluoride concentration above which treatment (or pretreatment) [would be] required.” The City’s ability to anticipate stricter discharge limitations like those ADEQ ultimately passed defeats any impossibility defense the City might have asserted, because it means the “non-occurrence” of such regulatory change was not a “basic assumption on which the contract was made.” Restatement (Second) of Contracts § 261 (1981); see also id. § 264, cmt. a (“With the trend toward greater governmental regulation, ... parties are increasingly aware of [the] risks [that new government regulations will frustrate performance], and a party may undertake a duty that is not discharged by such supervening governmental actions_ Such an agreement is usually interpreted as one to pay damages if performance is prevented_”); 12 Joseph M. Perillo, Corbin on Contracts § 64.10 (rev. ed. 1993) (explaining that in some cases where post-formation changes in law render performance illegal, “damages are still available as a remedy, either because the promisor assumed the risk or for other reasons”).
D
The City’s most basic counterargument is that the Ordinance is an “environmental regulation” of the sort Pure Wafer expressly agreed to obey, in section 9.1 of the Agreement. “No further analysis is *958 required,” says the City. We are not persuaded.
The trouble with the City’s argument is it completely ignores the context of the parties’ negotiations. As the district court put it, “Pure Wafer would not construct the Prescott facility without a commitment from the City that it could discharge up to 100 mg/L of fluoride,” for it “did not want to build a Prescott facility that could be ‘rendered useless at any time by the City.’ ” Much like the financial institutions in Winstar, “[i]t would ... have been madness for [Pure Wafer] to have engaged in these transactions with no more protection than the Government’s reading would have given them, for the very existence of their institutions would then have been in jeopardy from the moment their agreements were signed.” 518 U.S. at 910, 116 S.Ct. 2432 (plurality opinion).
The district court concluded that “[ale-cording to the City’s logic, this violation of the Agreement is not a breach of contract because Pure Wafer agreed not to discharge effluent in violation of local environmental regulations. But Pure Wafer neither anticipated nor agreed that it would comply with cost-shifting regulations cloaked as environmental regulations.” For the reasons explained above, we agree with the district court that Pure Wafer was not so reckless with its own future, and so we cannot accept the City’s position that by agreeing to section 9.1, Pure Wafer unwittingly welcomed a Trojan Horse containing within itself the seeds of destruction of its own business.
The City also derives no help from the “reserved powers doctrine,” which holds generally that “the exercise of the police power cannot be limited by contract for reasons of public policy; nor can it be destroyed by compromise,” for “it is beyond the authority of the state or the municipality to abrogate this power so necessary to the public safety.” N. Pac. Ry. Co. v. Minnesota, 208 U.S. 583, 598, 28 S.Ct. 341, 52 L.Ed. 630 (1908). Pure Wafer is not arguing that the City promised never to adopt regulations limiting the amount of fluoride industrial users like itself may discharge into the City’s sewer system. And giving Pure Wafer a contractual remedy for the City’s breach would not block the City from reducing the amount of fluoride exiting the City’s AWRF. As the City itself recognizes, “ultimately the only question is who should pay the cost of bringing the Facility into compliance with the amended City Code.” Indeed, the district court found that “if Pure Wafer does not pretreat its effluent, the City will do so to comply with its APP. Counsel for the City has suggested as much to the Court.” The City would not be forced to surrender any of its sovereign powers if it is held to its promise to bear the risk that a change in applicable laws might make performance under the Development Agreement more costly.
E
In light of the foregoing, we conclude that while the City prevails on its appeal of the Contract Clause issue, judgment for Pure Wafer can be sustained on the alternative ground that the City has breached its contract with Pure Wafer. We leave it for the district court on remand to decide the appropriate remedy.[14]
*959 IV
The judgment of the district court is AFFIRMED IN PART and REVERSED IN PART, and the case is REMANDED for further proceedings consistent with this opinion. The district court’s injunction forbidding enforcement of the Ordinance against Pure Wafer shall remain in effect during subsequent stages in this litigation. Each party shall bear its own costs on appeal.

. Pure Wafer has not questioned the City’s authority to enact the Ordinance. The City relies on a state statute, see Ariz. Rev. Stat. § 49-391, as well as Article I, Section 3 of its own Charter.

. It appears that there were or are at least six Significant Industrial Users in Prescott, including Pure Wafer, Each received an identical letter from the City directing them to comply with the Ordinance.

. The district court and both parties treat the Contract Clause of the Arizona Constitution, Ariz. Const, art. II, § 25, as identical in scope to its federal counterpart. Accordingly, like them, we confine our discussion to the federal Contract Clause.

. Our Circuit has previously held that § 1983 provides individuals with a cause of action to assert violations of the Contract Clause. S. Cal. Gas Co. v. City of Santa Ana, 336 F.3d 885, 887 (9th Cir. 2003) (per curiam). We note an apparent split of authority on the question. See, e.g., Crosby v. City of Gastonia, 635 F.3d 634, 640-41 (4th Cir.2011),

. To be sure, the Contract Clause does not automatically approve state action that merely alters the remedies available on a contract but stops short of wiping them out entirely; as Justice Cardozo observed (with some understatement), the “dividing line” between obligation and remedy “is at times obscure,” and some purely remedial changes may be too "oppressive and unnecessary” to pass muster under the Contract Clause. W.B. Worthen Co. v. Kavanaugh, 295 U.S. 56, 60, 62, 55 S.Ct. 555, 79 L.Ed. 1298 (1935). We need not linger over such difficulties, however, because as we explain, here the City has not attempted to tinker at all with the remedies Pure Wafer would be entitled to obtain in the event it proves a breach of contract.

. In fact, as noted above, the district court had ordered the trial proceedings bifurcated into a liability phase and a damages phase, something to which the City voluntarily agreed.

. We also note that the Agreement goes out of its way to state that “[i]n the event City is in default herein, [Pure Wafer] shall have all legal and equitable remedies available to it,” and further provides that the Agreement shall be enforceable "subject to a court’s equitable powers.” The City has not attempted to cast doubt on those provisions. Hence, in addition to damages, Pure Wafer may be able to request injunctive relief or specific performance if it so desires.

. Indeed, the district court itself recognized that "[t]he resolution of the issues in this case hinges on the nature and extent of the City's obligations to accept Pure Wafer’s effluent under the terms of the Agreement.” Those same inquiries overlap substantially with our breach of contract analysis. Given that the district court, in its Contract Clause analysis, made sufficient findings of fact to conclude that the City had breached the contract, we disagree with the dissent that remand is necessary.

. The dissent argues that because "we have dismissed the only federal claim before us” we must remand the case back to the district court so that it might determine whether it should continue to exercise supplemental jurisdiction over the breach of contract claim under 28 U.S.C. § 1367(a). Dissent at 959-60. The district court had supplemental jurisdiction, as do we, because the Contracts Clause claim is a federal question. We respectfully disagree with our dissenting colleague.
Section 1367(c) allows a district court to decline to exercise supplemental jurisdiction for one of four reasons. The district court could have invoked it and dismissed the state-law breach of contract claim at any time, but chose not to. And, nothing in this opinion precludes the district court from invoking § 1367(c) after we remand the case back to it. The dissent misreads § 1367(c)(3); it only applies when "the district court has dismissed all claims over which it has original jurisdiction.” (emphasis added).
The dissent relies on cases such as Fang v. U.S. to argue we are improperly usurping the district court’s discretion. Dissent at 960-62 (citing 140 F.3d 1238, 1240 (9th Cir. 1998)). But, we are reviewing a district court’s merit decision, not instructing the district court on whether to exercise supplemental jurisdiction. Fang involved a district court’s pretrial dismissal of federal claims for lack of jurisdiction, and then a dismissal of related state claims pursuant to § 1367(c)(3). Id. We reversed in that case, reinstating some of the federal claims and all of the state claims, but made clear the district court could reassess whether it should retain supplemental jurisdiction in the face of the defendant’s arguments that the state law claims raised novel issues of state law. Id. at 1241-43. Here, we are not dismissing or reinstating any state law claims. The dissent’s real objection is that we reach the merits of the breach of contract issue — but that is a separate concern from whether we are usurping the district court's § 1367(c) authority.

. The dissent contends that this breach of contract theory was never articulated by Pure Wafer in its Amended Complaint. Dissent at 962-63. It accuses us of inventing a new theory for Pure Wafer. Yet, Pure Wafer’s Amended Complaint articulates this theory several times. ¶¶ 3, 127, 142, Its two breach of contract claims incorporate preceding allegations and allege that by failing to exempt Pure Wafer from the Ordinance, as required by sections 9.2 and 14.4 of the Agreement, the City breached its contract. ¶¶ 149, 154. The logical conclusion from the Amended Complaint is that by trying to impose a new, lower discharge limit via the Ordinance, rather than exempting Pure Wafer, the City breached the Agreement. Of course, had the City exempted Pure Wafer it would not be in breach — a point no one contests.

. See also, e.g., Amino Bros. Co. v. United States, 372 F.2d 485, 491 (Ct. Cl. 1967) ("The Government cannot make a binding contract that it will not exercise a sovereign power, but it can agree in a contract that if it does so, it will pay the other contracting party the amount by which its costs are increased by the Government’s sovereign act.”).

. See also, e.g., Hughes Commc’ns Galaxy, Inc. v. United States, 998 F.2d 953, 959 (Fed. Cir. 1993) ("[Government] contracts routinely include provisions shifting financial responsibility to the government for events which might occur in the future. That some of these events may be triggered by sovereign government action does not render the relevant contractual provisions any less binding than those which contemplate third parly acts, inclement weather and other force majeure," (footnote omitted)).

. We disagree with the district court's determination that the City is obligated to accept Pure Wafer’s effluent "regardless of its fluoride concentration,” but this error is irrelevant to the outcome of the case.

. Because we affirm the district court’s judgment as to the City’s liability, we also AFFIRM its denial of the City’s counterclaim. We have no occasion to examine the City's objection to the district court's separate judgment that Pure Wafer is entitled to attorneys’ fees.
In addition, Pure Wafer's two motions for judicial notice, filed April 12, 2016, and April 13, 2016, are GRANTED.