**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | |
|---|---|
| LL LIQUOR, INC., DBA Lolo Liquor, *Plaintiff-Appellant,* <br><br> v. <br><br> STATE OF MONTANA; STEVE BULLOCK, in his official capacity as the Governor of Montana; MONTANA DEPARTMENT OF REVENUE; MIKE KADAS, in his official capacity as the Director of the Montana Department of Revenue; JOHN DOES, 1 through 10, <br><br> *Defendants-Appellees.* | No. 17-35405 <br><br> D.C. No. 6:15-cv-00071-SEH <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Montana
Sam E. Haddon, Senior District Judge, Presiding

Argued and Submitted May 15, 2018
Seattle, Washington

Filed December 28, 2018

Before:  Marsha S. Berzon, Stephanie Dawn Thacker,[*]
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Berzon

---

## SUMMARY[**]

### Civil Rights

The panel affirmed the district court's summary judgment in favor of the State of Montana with respect to LL Liquor's claim that that Montana's Senate Bill 193, which restructured the formula for calculating the rate at which state-approved agency franchise stores could purchase liquor from the state, impaired LL Liquor's contract to purchase liquor with the Montana Department of Revenue, in violation of the Contracts Clause.

The panel held Montana did not impair its contractual obligation to LL Liquor within the meaning of the Contracts Clause because it did not eliminate LL Liquor's remedy for breach of its contract with the state. The panel addressed LL Liquor's breach-of-contract claim in a memorandum disposition filed concurrently with the panel's opinion.

---

[*] The Honorable Stephanie Dawn Thacker, United States Circuit Judge for the U.S. Court of Appeals for the Fourth Circuit, sitting by designation.

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

**COUNSEL**

Jesse C. Kodadek (argued) and Ronald A. Bender, Worden Thane P.C., Missoula, Montana, for Plaintiff-Appellant.

Christopher Thayne Sweeney (argued) and W. Anderson Forsythe, Moulton Bellingham PC, Billings, Montana, for Defendants-Appellees.

**OPINION**

BERZON, Circuit Judge:

The sale of liquor in Montana is heavily regulated. Montana maintains a monopoly on the distribution of liquor within the state through the Montana Department of Revenue (DOR). *See Duane C. Kohoutek, Inc. v. State Dep't of Revenue*, 417 P.3d 1105, 1107–08 (Mont. 2018). The DOR controls the supply of liquor and provides liquor to state-approved "agency franchise stores," which are privately owned. *See id.* With narrow exceptions, agency franchise stores must purchase their liquor directly from the DOR. *See* Mont. Code Ann. § 16-2-101 (2017). The stores may then sell the liquor either wholesale, to bars and restaurants, or retail, to individual consumers. LL Liquor, Inc., which does business as "Lolo Liquor," is one of ninety-six liquor stores in the state.

Until 2016, the DOR did not use a uniform pricing scheme for agency franchise stores. Instead, the price of liquor varied based on discount rates set forth in each store's "agency franchise agreement," a contract between the DOR and the individual store. A higher discount rate meant cheaper liquor. These discount rates—known as

"commission rates"—were negotiated between the DOR and each store.

Two years into the term of Lolo Liquor's contract, Montana changed the rules, applying a uniform commission structure to all franchise stores in the state. The principal question before us is whether this change gives rise to a Contracts Clause claim by Lolo Liquor against the state. We conclude that it does not.[1]

# I

## A

In March 2013, Lolo Liquor entered into a ten-year franchise agreement with the DOR to operate an agency franchise store based in Lolo, Montana, a town about ten miles outside Missoula. Three sections of that agreement are particularly relevant here.

Section 2, titled "Agency Franchise Agreement," provided that the "Agreement must be renewed every ten years if the requirements of [the] Agreement have been satisfactorily performed," with the caveat that "[s]ubsequent changes to the law by the legislature may require terms to change in future renewals." This provision referenced section 16-2-101(5)(a) of the Montana Code, which, at the time the agreement was made, stated that an agency franchise agreement "must be renewed at the existing commission rate for additional 10-year periods." Mont. Code Ann. § 16-2-101(5)(a) (2013). Section 2 also stated that, "[d]uring the term of [the] Agreement, the commission

---

[1] In a concurrently filed memorandum disposition, we conclude that Lolo Liquor is entitled to relief on its remaining claim for breach of contract under state law.

. . . rate may be reviewed every three years, as provided by law." This clause included a reference to section 16-2-101(6) of the Montana Code, which at that time provided that the commission rate "may be reviewed every 3 years at the request of either party" but that the rate would only be adjusted "[i]f the [the franchise store] concurs." *Id.* § 16-2-101(6).

Section 5, titled "Agent's Discount Rates," set forth how the commission rate of 16.144% was calculated. That commission rate comprised three separate discount rates: the "commission percentage discount rate" (11.400%), the "weighted average discount percentage rate" (3.869%), and the "volume of sales discount rate" (0.875%). The commission percentage discount rate was the part of the commission rate subject to negotiation; the remaining two discount rates were set by statute. This section also noted that Lolo Liquor's commission rate "may be reviewed and adjusted in accordance with Montana law." Notably, the commission rate was the only financial term found in the agreement.

Finally, section 11, titled "Modification, Merger, and Definitions," provided that "[t]he parties agree that the [DOR] may amend or modify [the] Agreement to conform to changes in state or federal laws." Additionally, Section 11 included a merger clause, which stated that the agreement would "not be enlarged, modified or altered except in writing signed by all parties," with one important caveat—"that any change required by a change in Montana law shall be effective immediately upon the effective date of such change in law, notwithstanding the failure of a party to agree in writing to such change." Section 11 also required that the parties "make reasonable efforts to promptly reduce to

writing the specific changes to the provision of this Agreement that may be required by such change in law."

**B**

In 2014, Lolo Liquor was purchased by its current owners, Josh and Leigh Paffhausen. The Paffhausens maintain that, around the time of the purchase, they were given assurances by the DOR that their commission rate "could never be lowered" during the term of the agreement. Soon after purchasing Lolo Liquor, the Paffhausens began an aggressive expansion into the wholesale market, both around the town of Lolo and beyond. The expansion was quite successful—in three years, Lolo Liquor was buying more than ten times as much liquor from the DOR as it had before the Paffhausens' purchase. The Paffhausens attributed their success to innovation and customer service, while their competitors maintained that Lolo Liquor's success was due its higher commission rate, which enabled Lolo Liquor to provide services that others could not.

Around the time Lolo Liquor was expanding, the Liquor Store Owners Association of Montana, an industry group, proposed changes to the commission structure for agency franchise stores. This proposal was eventually introduced in the Montana Senate as Senate Bill (SB) 193. In 2015, the Montana Legislature passed SB 193, and the bill was signed into law. *See* 2015 Mont. Laws ch. 362.

SB 193 restructured the way in which commission rates are calculated. Under SB 193, the commission rates would no longer be determined by negotiations between the DOR and each store. Instead, the rates would be based on a preset schedule reflecting each store's total liquor purchases from the DOR during the previous calendar year. The less a store purchased in the last year, the higher its commission rate

would be. *See* Mont. Code Ann. § 16-2-101(4)(b) to -101(4)(c) (2017). Because the amount purchased by each store is largely based on the store's sales, this change meant that stores selling less liquor would receive higher commission rates—and thus cheaper liquor—from the DOR. *See id.* These new rates did not take effect immediately; they were gradually phased in over the course of two years, beginning in February 2016. *Id.* § 16-2-101(4)(a).

Under the new enactment, most agency franchise stores received a modest increase in their commission rates. Lolo Liquor, however, saw a reduction. The Paffhausens, understandably unhappy with the change, refused to sign an addendum sent by the DOR informing them of the revised commission structure. The DOR continued to sell liquor to Lolo Liquor but, in February 2016, unilaterally implemented the new commission structure in accordance with SB 193, over the Paffhausens' objections.

## C

Shortly after SB 193 was enacted, Lolo Liquor sued in state court for, among other claims, breach of contract and violations of the Contracts Clause of the U.S. Constitution and its state counterpart. Lolo Liquor's complaint sought damages and declaratory and injunctive relief. According to the complaint, section 2 of the agreement promised that the commission rate would not change without Lolo Liquor's consent during the ten-year term of the agreement. Montana's unilateral change of the commission structure, the complaint alleged, either breached the agreement or impaired a contractual obligation in violation of the Contracts Clause.

Montana removed the case to federal district court, after which Lolo Liquor moved for a preliminary injunction based

on its Contracts Clause claims. In response, Montana argued that Lolo Liquor was unlikely to prevail on its Contracts Clause claims because, under section 11 of the agency franchise agreement, the parties had expressly agreed that "any change required by a change in Montana law shall be effective immediately upon the effective date of such change in law, notwithstanding the failure of a party to agree in writing to such change." The district court agreed with the state and denied Lolo Liquor's request for a preliminary injunction. On appeal, a panel of this court affirmed in a memorandum disposition. *LL Liquor, Inc. v. Montana*, 649 F. App'x 627 (9th Cir. 2016) (unpublished decision).

Back in the district court, Montana moved for summary judgment on all claims, and Lolo Liquor cross-moved for partial summary judgment on its Contracts Clause claims. The district court granted summary judgment to Montana. *LL Liquor, Inc. v. Montana*, No. CV 15-71-H-SEH, 2017 WL 1497872 (D. Mont. Apr. 25, 2017). This appeal followed.

## II

The Contracts Clause provides that "[n]o state shall . . . pass any . . . Law impairing the Obligation of Contracts," U.S. Const. art. I, § 10, cl. 1, thereby "restrict[ing] the power of States to disrupt contractual arrangements," *Sveen v. Melin*, 138 S. Ct. 1815, 1821 (2018).[2] But not all state

---

[2] The Supreme Court has bounced between using the plural "Contracts" and the singular "Contract" when referring to this Clause. *Compare, e.g.*, *Sveen*, 138 S. Ct. at 1821 (plural), *with Evenwel v. Abbott*, 136 S. Ct. 1120, 1138 (2016) (singular). Other federal courts have been similarly inconsistent. *Compare, e.g.*, *Allen v. Cuomo*, 100 F.3d 253, 256 (2d Cir. 1996) (plural), *with RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1141 (9th Cir. 2004) (singular). Because the text of the Clause uses

regulation of contracts gives rise to a Contracts Clause claim. Instead, "[t]he threshold issue is whether the state law has 'operated as a substantial impairment of a contractual relationship.'" *Id.* at 1821–22 (quoting *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 244 (1978)). "This inquiry has three components: whether there is a contractual relationship, whether a change in law impairs that contractual relationship, and whether the impairment is substantial." *Gen. Motors Corp. v. Romein*, 503 U.S. 181, 186 (1992).[3]

Here, no one disputes that the agency franchise agreement at issue is a cognizable contractual relationship under the Contracts Clause. We turn, then, to whether Montana impaired a contractual relationship within the meaning of the Contracts Clause.

## A

The Supreme Court has long rejected the notion that an interpretive disagreement over a contract—even if that contract is with a state or municipality—can, on its own, implicate the Contracts Clause. That argument, the Court has noted, "reduces itself at once to the proposition that wherever it is asserted on the one hand that a municipality is bound by a contract to perform a particular act and the

---

the plural, so do we. *See* U.S. Const. art. I, § 10, cl. 1; *see also Crosby v. City of Gastonia*, 635 F.3d 634, 638 n.2 (4th Cir. 2011).

[3] To be sure, courts do not always proceed methodically from the first two questions (i.e., whether there was a contractual relationship and whether that relationship was impaired) to the third (i.e., whether that impairment was substantial). That is because "[n]ormally, the first two are unproblematic, and we need address only the third." *Romein*, 503 U.S. at 186. As we explain below, this case is different.

municipality denies that it is liable under the contract to do so, thereby an impairment of the obligations of the contract arises in violation of the Constitution of the United States." *St. Paul Gaslight Co. v. City of St. Paul*, 181 U.S. 142, 149 (1901). And, as *St. Paul Gaslight* explained, that proposition "amounts only to the contention that every case involving a controversy concerning a [governmental] contract is one of Federal cognizance, determinable ultimately in this court." *Id.*

Consistently with *St. Paul Gaslight*, we have been careful to distinguish between situations in which the state "has 'impaired the obligation' of its contract" and those in which it "has simply *breached* its contract with the private party." *Pure Wafer Inc. v. City of Prescott*, 845 F.3d 943, 951 (9th Cir. 2017); *accord Univ. of Haw. Prof'l Assembly v. Cayetano*, 183 F.3d 1096, 1102–03 (9th Cir. 1999). *Pure Wafer* reiterated that "conflating the two concepts would risk making a federal constitutional case out of even the most garden variety public contract dispute, transforming the Contract Clause into a font of state contract law." 845 F.3d at 951; *see also Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996). Implementing this distinction, *Pure Wafer* concluded that state action does not "impair" a contractual obligation within the meaning of the Contracts Clause "so long as it leaves both parties free to obtain a court-ordered remedy (typically damages) in the event that either of them fails to perform as promised." 845 F.3d at 951. But where state action "not only adversely affects [a party's] contractual expectations, but . . . slams the door on any effective remedy," the Contracts Clause is implicated. *Cayetano*, 183 F.3d at 1104; *see also Romein*, 503 U.S. at 189 ("[C]hanges in the laws that make a contract legally enforceable may trigger Contract Clause scrutiny if

they impair the obligation of pre-existing contracts, even if they do not alter any of the contracts' bargained-for terms.").

As an example, consider *Cayetano*. That case considered a law allowing the state to postpone the dates on which state employees were paid, despite a prior collective bargaining agreement providing that those employees would be paid semimonthly. *Cayetano*, 183 F.3d at 1102, 1104. That change in law left the plaintiffs with no remedy under contract law, as state law did not provide a cause of action for breach of a labor agreement with the state, and any other remedies (such as arbitration or a complaint to a state agency) would be "more theoretical than real." *Id.* at 1104. Because the state had "not merely relieved itself of a contractual obligation" but "eliminated any avenues of redress," we concluded that the state had "impaired" its contractual obligation within the meaning of the Contracts Clause. *Id.*

By contrast, *Pure Wafer* held the Contracts Clause not implicated by a city ordinance limiting the amount of pollutants industrial users were permitted to discharge into the city's sewer lines, notwithstanding a preexisting contract with a plaintiff company authorizing the company to discharge a certain concentration of pollutant. 845 F.3d at 947–49, 952. There, "the City . . . never asserted the Ordinance as a defense that would have the legal effect of discharging the City's duty to perform." *Id.* at 952. Instead, "the thrust of [the city's] argument" was that the company had "'agreed to comply with environmental regulations,' and that the 'cost of regulatory compliance [was] not a term that was bargained for.'" *Id.* at 953 (second alteration in original). Thus, the city attempted only "to *refute* the company's claimed rights under the Agreement," not "to render such rights legally unenforceable." *Id.* Accordingly,

"the City [did] not impair[] the obligation of its contract." *Id.* at 952.

## B

Our question, then, as to whether the Contracts Clause is implicated is whether, following the enactment of SB 153, Lolo Liquor would have a remedy under state law against Montana for breach of contract, if it can establish such a breach. If Montana would provide a state law remedy, then its alteration of the commission structure was not an "impairment" within the meaning of the Contracts Clause. If it does not so provide, then our inquiry under the Contracts Clause continues. In making this determination, we look to what remedies would in fact be available under state law. *See Cayetano*, 183 F.3d at 1104.

More specifically, Lolo Liquor maintains here that Montana promised in the agency franchise agreement that the commission rate would not change during the ten-year term of the agreement unless Lolo Liquor consented, but then breached that promise by lowering the rate in accordance with SB 193. If Lolo Liquor retains the ability to recover for this alleged breach under state law, then it does not have a Contracts Clause claim. *See Pure Wafer*, 845 F.3d at 951. We must therefore consider Montana's defenses to liability for the alleged breach. Particularly relevant to our analysis is whether Montana is attempting only "to *refute* [Lolo Liquor's] claimed rights" under the agreement, or whether the state is trying "to render such rights legally unenforceable." *Id.* at 953.

Here, Montana provides two related reasons why Lolo Liquor cannot recover for a breach of contract. First, Montana argues that the parties expressly acknowledged in section 11 that any provision of the agreement—including

the established commission rate—was subject to modification by state law. Thus, Montana contends, its adjustment of the commission rates was fully consistent with the terms of the agreement. Second, Montana asserts that "when a state, exercising its sovereign power, enters into a franchise agreement," as Montana did here, "the sovereign may retain the right to unilaterally modify the terms of the agreement." Montana therefore suggests that, without regard to section 11, the state was permitted to adjust the commission rates without Lolo Liquor's consent.

Montana's first argument does not implicate the Contracts Clause. With that contention, Montana is responding to a contractual—not a constitutional—argument made by Lolo Liquor. Lolo Liquor interprets the agreement to provide a right to a fixed commission rate during the agreement's duration; Montana disagrees.

That one of the provisions at issue—section 11—could permit Montana unilaterally to modify the agreement does not compel a different conclusion. If the parties agreed that the commission rate would not change, then Montana breached the agreement by changing the commission rate. If the parties agreed that the commission rate was subject to unilateral modification, then no breach occurred. At bottom, the parties' arguments amount to dueling interpretations between the parties over the proper meaning of their agreement. As in *Pure Wafer*, to the extent Montana's defense is grounded in the meaning of the contract, the state has not "attempted to render such [a] right[] legally unenforceable" but has instead "attempted to *refute*" the existence of that right. *Id.* at 953. Such an attempt does not trigger Contracts Clause scrutiny.

Our decision in *Southern California Gas Co. v. City of Santa Monica*, 336 F.3d 885 (9th Cir. 2003), does not

suggest otherwise. There, the asserted "contract" was a city ordinance that gave rights to a gas company to construct and maintain "pipes and appurtenances" under the city's streets. *Id.* at 887. Several decades later, the city passed another ordinance that effectively eliminated those rights. *Id.* at 888. In response to a Contracts Clause claim brought by the gas company, the city argued that the new ordinance did not substantially impair the contract, because the original ordinance "subject[ed] the Gas Company's rights to all ordinances 'heretofore or hereafter adopted . . . in the exercise of [the city's] police powers.'" *Id.* at 893 (omission in original). By agreeing to operate under the ordinance, the city argued, the company had "expressly acknowledged that its rights under the [contract] could be altered by future police power ordinances." *Id.* We rejected that argument, recognizing that the city could not "avoid Contract Clause analysis merely by establishing that the . . . ordinance [was] an otherwise legitimate exercise of police power." *Id.* We therefore declined to read the contract "in a way that reserve[d] to [the city] the power to unilaterally alter the terms of the agreement." *Id.*

In *Southern California Gas*, however, the gas company did not bring a breach-of-contract claim; indeed, it is unclear whether the company could have brought such a claim, given that the asserted "contract" was another city ordinance. *See id.* at 887.**[4]** Moreover, we specifically noted that "the parties

---

**[4]** In earlier decisions, the Supreme Court suggested that "the word 'contracts' in section 10 of article 1 of the Constitution is used in its usual or popular sense as signifying an agreement of two or more minds, upon sufficient consideration, to do or not to do certain acts." *Crane v. Hahlo*, 258 U.S. 142, 146 (1922). Later, however, the Court clarified that the question whether there is a contractual relationship for purposes of the Contracts Clause is distinct from whether there is a contract under state law. *See Gen. Motors Corp.*, 503 U.S. at 187 ("The question whether a

agree[d] . . . that the Gas Company's claim [was] properly analyzed under the Contract Clause, rather than as a common breach of contract." *Id.* at 889 (citing *Cayetano*, 183 F.3d at 1102–04). Thus, *Southern California Gas* had no opportunity to conclude—as we do here—that dueling contractual interpretations give rise to only a breach-of-contract claim, not a Contracts Clause claim. *See Estate of Magnin v. Comm'r*, 184 F.3d 1074, 1077 (9th Cir. 1999) ("When a case assumes a point without discussion, the case does not bind future panels.").

Lolo Liquor also relies on the Montana Supreme Court's decision in *Seven Up Pete Venture v. State*, 114 P.3d 1009 (Mont. 2005), to argue that differing contractual interpretations can give rise to a Contracts Clause claim. *Seven Up Pete*, too, is consistent with our approach here.**[5]**

In *Seven Up Pete*, Montana passed a statute that banned a certain technique for gold and silver mining. *Id.* at 1015. A

---

contract was made is a federal question for purposes of Contract Clause analysis, and 'whether it turns on issues of general or purely local law, we can not surrender the duty to exercise our own judgment.'" (citation omitted) (quoting *Appleby v. City of New York*, 271 U.S. 364, 380 (1926))); *see also San Diego Police Officers' Ass'n v. San Diego City Emps.' Ret. Sys.*, 568 F.3d 725, 737 (9th Cir. 2009). Thus, under the Contracts Clause, the Court has recognized that "a statute is itself treated as a contract when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State." *U.S. Tr. Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977). Whether that statute also constitutes a contract under state law and so gives rise to a cause of action for breach of contract is a separate inquiry.

**[5]** Of course, were *Seven Up Pete* inconsistent with our analysis, we would not be bound by it, as the issue here is the reach of the federal Constitution. *See Taylor v. San Diego County*, 800 F.3d 1164, 1171 (9th Cir. 2015).

mining company that had previously received a state-issued mining lease challenged enforcement of the statute, alleging that it violated the Contracts Clause by impairing the mining lease. *See id.* In response, Montana argued that the mining lease was not substantially impaired because the lease expressly stated that the company "agreed to 'fully comply with all applicable state and federal laws, rules and regulations.'" *Id.* at 1022. *Seven Up Pete* rejected this position, reasoning that the provision could not "reasonably be construed to contemplate a . . . ban of the one mining method admittedly contemplated by the parties," and ultimately concluded that the ban substantially impaired the mining company's contractual relationship with Montana. *Id.*

Importantly, the mining lease in *Seven Up Pete* did not in terms provide that the company would be permitted to use the mining technique at issue. Instead, the lease was "based on the *assumption*, held by all parties, that the [mining technique] would be used." *Id.* (emphasis added). Indeed, *Seven Up Pete* confirmed that the mining company "lacked a . . . contract right to use" the specified mining technique. *Id.* Given that the mining company could not successfully challenge the mining technique ban as a breach of contract, *Seven Up Pete*'s conclusion that the company could bring a Contracts Clause claim is in accord with our reasoning here. *See id.*; *cf. Cayetano*, 183 F.3d at 1104.[6]

---

[6] As noted above, whether a contractual relationship exists for purposes of the Contracts Clause is separate from whether a contract exists under state law. *See supra* note 4. It is therefore possible for a plaintiff to state a claim under the Contracts Clause but not under state contract law. We express no view on the correctness of *Seven Up Pete*'s ultimate holdings with respect to either the Contracts Clause or state contract law.

Montana's second argument—that the state was permitted within its sovereign power to modify the commission rate whether or not doing so breached the contract—raises the specter of a Contracts Clause problem. An assertion that the state always has the unilateral authority to modify the provisions of a contract is inconsistent with the requirements of the Contracts Clause, which prohibits a state from "simply walk[ing] away from its financial obligations." *Energy Reserves Grp., Inc. v. Kan. Power & Light Co.*, 459 U.S. 400, 413 n.14 (1983).[7] Not surprisingly, no such authority exists.

The cases on which Montana relies establish that a state does not give up its sovereign power by contracting with others. *See U.S. Tr. Co.*, 431 U.S. at 23–24; *see also Ft. Smith Light & Traction Co. v. Bd. of Imp. of Paving Dist. No. 16*, 274 U.S. 387, 390 (1927). It is an entirely different question whether a state may avoid financial liability when future exercises of the state's sovereign power breach a contract and result in financial harm. As we noted in *Pure Wafer*, it is commonplace for states and municipalities to promise regulatory stability and pay damages if, for whatever reason, the promise is ultimately not kept. *See* 845 F.3d at 955–96. The Supreme Court, too, has recognized that such arrangements are permissible. *See United States v.*

---

[7] We do not understand Montana's argument to rest on state law concerning its sovereign prerogatives. All the case authority cited by the state is federal. Again, if state law did allow Montana unilaterally to modify contracts between itself and others without providing a damages remedy, then the federal Contracts Clause would be squarely implicated. But we have been provided no basis for so construing Montana law. To the contrary, the Montana Supreme Court has recognized that the state has affirmatively waived sovereign immunity for claims relating to express contracts. *See Peretti v. State*, 777 P.2d 329, 333 (Mont. 1989); *see also* Mont. Code Ann. § 18-1-404(1)(a) (2017).

*Winstar Corp.*, 518 U.S. 839, 871 (1996) (plurality opinion). These types of contracts do not "bind [the government] to ossify the law in conformity to the contracts." *Id.* Instead, under these contracts, "the Government assume[s] the risk that subsequent changes in the law might prevent it from performing, and agree[s] to pay damages in the event that such failure to perform cause[s] financial injury." *Id.*

If Montana did promise to maintain Lolo Liquor's commission rate regardless of future changes in the law, it still retained its sovereign power to change the law. That Lolo Liquor, as the recipient of that promise, is entitled to recover for damages resulting Montana's breach does not detract from that conclusion.

Because this alternative argument is baseless, Montana cannot rely on it to avoid Lolo Liquor's claim for breach of contract. Thus, this argument too does not "render [Lolo Liquor's] rights legally unenforceable," and so does not implicate the Contracts Clause. *Pure Wafer*, 845 F.3d at 953.

## C

As Lolo Liquor's ability to recover under state law remains intact, we conclude that Montana's passage of SB 153 did not impair a contractual obligation under the Contracts Clause. Lolo Liquor therefore has no claim under the Contracts Clause, and the district court did not err in granting summary judgment to Montana on this claim.

## III

In sum, we hold that Montana did not impair its contractual obligation to Lolo Liquor within the meaning of the Contracts Clause, because it did not eliminate Lolo Liquor's remedy for breach of its contract with the state.

Accordingly, we affirm the district court's grant of summary judgment to Montana on Lolo Liquor's Contracts Clause claim. We address Lolo Liquor's breach-of-contract claim in a memorandum disposition filed concurrently with this opinion.

**AFFIRMED.**