**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

OAKLAND BULK & OVERSIZED
TERMINAL, LLC,
                *Plaintiff-Appellee*,

v.

CITY OF OAKLAND,
                *Defendant-Appellant*,

and

SIERRA CLUB; SAN FRANCISCO
BAYKEEPER,
   *Intervenor-Defendants-Appellants.*

Nos.  18-16105
        18-16141

D.C. No.
3:16-cv-07014-
VC

OPINION

Appeal from the United States District Court
for the Northern District of California
Vince Chhabria, District Judge, Presiding

Argued and Submitted November 12, 2019
San Francisco, California

Filed May 26, 2020

Before:  Carlos T. Bea and Kenneth K. Lee, Circuit Judges,
and Lawrence L. Piersol,* District Judge

Opinion by Judge Lee;
Dissent by Judge Piersol

## SUMMARY**

### Breach of Contract

The panel affirmed the district court's judgment following a bench trial holding that the City of Oakland breached an agreement to have Oakland Bulk & Oversized Terminal develop a commercial rail-to-ship terminal on the site of a shuttered U.S. Army base near the bay.

After an announcement that coal would be transported through the terminal, the City held public hearings, passed an ordinance and adopted a resolution that barred coal at the facility, citing a provision in the parties' agreement that allowed it to impose new regulations if "substantial evidence" showed that a project would be "substantially dangerous" to "health and safety."  The district court held a bench trial and found that the City's health and safety determination about coal was "riddled with inaccuracies, major evidentiary gaps, erroneous assumptions, and faulty analyses."  The district court determined that the City

* The Honorable Lawrence L. Piersol, United States District Judge for the District of South Dakota, sitting by designation.

** This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

breached the agreement with Oakland Bulk & Oversized Terminal (OBOT) when it passed the resolution barring coal, and it declared the resolution invalid.

In determining the appropriate standard of review on appeal, the panel held that it would review the case as a breach of contract dispute rather than an administrative law proceeding, and therefore it would give deference to the trial court's factual findings. The panel rejected the City's contention that the district court erred by applying the traditional rules that govern a breach of contract case rather than adhering to administrative law review principles. The panel therefore held that the district court owed no deference to the City's factual determinations and did not err in considering extra-record evidence beyond what was presented at the public hearings.

The panel held that the district court did not clearly err in finding that the City lacked substantial evidence of a substantial danger to health or safety when it enacted its resolution barring coal. Specifically, the panel held that the district court did not err in finding that: (1) the City's estimates of dust emission from the transported coal were unreliable; (2) the report showing that OBOT's proposed coal operation would cause particulate matter to exceed state standards was flawed; (3) the evidence the City relied on to show that any volume of coal emission was harmful did not credibly establish a substantial danger; and (4) the City's evidence pertaining to the risk of coal fire was speculative, contradicted by the record and lacking consideration of the fire department's oversight. The panel found that the other expert evidence in the record suffered from the same flaws that the district court plausibly identified in its findings of fact.

The panel considered two alternative arguments brought by Intervenors Sierra Club and San Francisco Baykeeper. The panel held that the Intervenor's proposed interpretation of Section 3.4.2 of the agreement, as limiting only the City's regulation of land use, was inconsistent with the language of the agreement as a whole. The panel held that the plain language of the agreement manifested a clear intent of the parties to freeze all existing regulations, not just land use regulations.  The panel further found that the district court acted within its discretion in declining to consider Intervenors' additional attempt to void the agreement. Finally, the panel held that the district court did not abuse its discretion in denying intervention of right.

Dissenting, District Judge Piersol stated that it was error for the trial court to admit and consider evidence pertaining to the health and safety effects of coal handling and storage upon nearby residents that was not submitted to the City. Judge Piersol stated that based on the entire record before the City, a reasonable mind might accept as adequate the City's conclusion that coal handling and storage at the terminal would pose a substantially dangerous threat to the health and safety to community members.  Accordingly, Judge Piersol would reverse the district court's judgment and remand.

**COUNSEL**

Stacey M. Leyton (argued), James M. Finberg, and Andrew Kushner, Altshuler Berzon LLP, San Francisco, California; Barbara J. Parker, City Attorney; Maria S. Bee, Chief Assistant City Attorney; Jamilah A. Jefferson, Senior Deputy City Attorney; Office of the City Attorney, Oakland, California; for Defendant-Appellant.

Colin C. O'Brien (argued), Adrienne Bloch, Heather M. Lewis, and Marie E. Logan, Earthjustice, San Francisco, California; Jessica Yarnall Loarie and Joanne Spalding, Sierra Club, Oakland, California; Daniel P. Selni, Los Angeles, California; for Intervenor-Defendants-Appellants.

Robert P. Feldman (argued) and Andrew P. March, Quinn Emanuel Urquhart & Sullivan LLP, Redwood Shores, California; William B. Adams and Meredith M. Shaw, Quinn Emanuel Urquhart & Sullivan LLP, New York, New York; for Plaintiff-Appellee.

Tamara S. Galanter and Sara A. Clark, Shute Mihaly & Weinberger LLP, San Francisco, California; Carol R. Victor, East Bay Regional Park District, Oakland, California; for Amicus Curiae East Bay Regional Park District.

Xavier Becerra, Attorney General; Christie Vosburg, Supervising Deputy Attorney General; Scott Lichtig and Suma Peesapati, Deputy Attorneys General; Office of the Attorney General, San Diego, California; for Amicus Curiae State of California.

Jonathan C. Evans, Center for Biological Diversity, Oakland, California, for Amici Curiae West Oakland Environmental Indicators Project, Asian Pacific Environmental Network, No Coal in Oakland, West Oakland

Neighbors, Communities for a Better Environment, and Center for Biological Diversity.

James R. Williams, County Counsel; Greta S. Hansen, Chief Assistant County Counsel; Susan P. Greenberg, Deputy County Counsel; Office of the County Counsel, County of Santa Clara, San José, California; for Amicus Curiae California State Association of Counties.
Kenneth J. Rumelt, Vermont Law School, Environmental & Natural Resources Law Clinic, South Royalton, Vermont, for Amici Curiae Arthur Chen, Wendel Brunner, Wendy J. Parmet, Julia Walsh, Claire Broome, Thomas McKone, and John Swartzberg.

Kenneth B. Bley, Cox Castle & Nicholson LLP, Los Angeles, California, for Amicus Curiae California Building Industry Association.

Michael B. Kimberly and Matthew A. Waring, Mayer Brown LLP, Washington, D.C.; Katie Sweeney, National Mining Association, Washington, D.C.; Ellen Steen and Travis Cushman, American Farm Bureau Federation, Washington, D.C.; Peter C. Tolsdorf and Leland P. Frost, Manufacturers' Center for Legal Action, Washington, D.C.; Richard Moskowitz, American Fuel & Petrochemical Manufacturers, Washington, D.C.; for Amici Curiae National Mining Association, National Association of Manufacturers, American Farm Bureau Federation, and American Fuel & Petrochemical Manufacturers.

## OPINION

LEE, Circuit Judge:

In a bid to revitalize the site of a shuttered U.S. Army base near the bay, the City of Oakland agreed to have Oakland Bulk & Oversized Terminal, LLC ("OBOT") develop a commercial terminal there. But amid public backlash after the announcement that coal would be transported through the terminal, Oakland moved to block coal there, citing a provision in the agreement that allows it to impose new regulations if "substantial evidence" shows that the project would be "substantially dangerous" to "health and safety."

At the San Francisco federal courthouse just miles across the bay from the site of the proposed terminal, the district court held a bench trial on whether Oakland breached its contract with OBOT. The court ruled against Oakland, finding that its health and safety determination about coal was "riddled with inaccuracies, major evidentiary gaps, erroneous assumptions, and faulty analyses."

The City of Oakland and Intervenors Sierra Club and San Francisco Baykeeper appeal the district court's ruling. We have jurisdiction under 28 U.S.C. § 1291. A key legal issue is whether we defer to the district court's factual findings or the City's health and safety findings. Because this is a breach of contract dispute — and not an administrative law proceeding — we must defer to the district court's factual findings, which were not clearly erroneous. We affirm.

## BACKGROUND

### I.   Oakland contractually agrees to have a former Army base developed into a commercial terminal.

After the Oakland Army Base closed in 1999, the City of Oakland acquired some of its land.  The City initiated a redevelopment plan in West Oakland to counter the physical and economic blight caused by closure of the base.  As part of this plan, the City in 2012 entered into a Lease Disposition and Development Agreement with OBOT's predecessor-in-interest.[1]  This agreement envisioned the development of a rail-to-ship terminal on the West Gateway portion of the closed base, which lies south of the Bay Bridge Toll Plaza and west of West Oakland.

In 2013, Oakland and OBOT entered into a Development Agreement (the "Agreement"), which gave OBOT the "right to develop the Project in accordance with . . . the City Approvals and the Existing City Regulations."   Under California law, development agreements are intended to assure that, "upon approval of the project, the applicant may proceed with the project in accordance with existing policies, rules and regulations." Cal. Gov. Code § 65864(b). In other words, governmental regulations are frozen in recognition that a private party is investing substantial resources for the development project.  This eliminates the "lack of certainty" that can "discourage investment in and commitment to comprehensive planning which would make maximum efficient utilization of resources." *Id*. § 65864(a). To that end, California Government Code Section 65866(a) provides that "those rules, regulations, and official policies

---

[1] OBOT and its predecessor-in-interest, Prologis CCIG Oakland Global, LLC, are together referred to here as "OBOT."

in force at the time of execution" continue to apply to the project under a development agreement. *Id*. § 65866(a).

Consistent with this regulatory framework, the Agreement froze existing regulations as to OBOT's proposed terminal, except to provide under Section 3.4.2 that:

> City shall have the right to apply City Regulations adopted by City after the Adoption Date, if such application (a) is otherwise permissible pursuant to Laws (other than the Development Agreement Legislation), and (b) *City determines based on substantial evidence and after a public hearing that a failure to do so would place existing or future occupants or users of the Project, adjacent neighbors, or any portion thereof, or all of them, in a condition substantially dangerous to their health or safety*.

(emphasis added). Importantly, the Agreement did not limit the types of bulk goods that could be shipped through the terminal. And prior to its execution, Oakland had some indication that coal was one of the potential commodities that might be handled.

## II. Amid backlash at coal being shipped through the terminal, Oakland moves to block the proposed plan.

In 2014, OBOT agreed to sublease the terminal to Terminals and Logistics Solutions, LLC ("TLS"), a subsidiary of a Utah coal company. TLS intended to ship commodities, including western bituminous coal from Utah,

through the terminal. TLS delivered a letter to the City outlining its plan for the terminal.

Once word spread that coal would be shipped through the terminal, public and political pressure mounted against this plan due to concern that coal dust would affect the air quality of West Oakland residents and those working at the terminal. In September 2015, Oakland held an initial public hearing to assess the potential health and safety effects of OBOT's proposed coal operations. In connection with the hearing, the city received: (i) an expert report by HDR Engineering supporting the project; (ii) expert reports by Dr. Phyllis Fox and Sustainable Systems Research, LLC opposing the project; and (iii) numerous comments from the public.

Following the hearing, Oakland solicited additional comments and evidence. It retained Environmental Science Associates ("ESA") to analyze the evidence and evaluate the health and safety risks from the proposed coal operations. Separately, a councilmember also commissioned Dr. Zoe Chafe to prepare a report.

In June 2016, Oakland held a second public hearing. In connection with this hearing, Oakland received expert reports by ESA, Dr. Chafe, and the Public Health Advisory Panel ("PHAP"), all opposed to the project. The ESA report — a highly technical 160-page expert report — was publicly released one business day before the hearing.

Following the hearing, Oakland enacted Ordinance No. 13385 (the "Ordinance"), which categorically barred bulk material facilities in Oakland from maintaining, loading, transferring, storing or handling any coal. The City then invoked Section 3.4.2 of the Agreement and adopted Resolution No. 86234 (the "Resolution"), which applied the

Ordinance specifically to OBOT's terminal. The passage of the Ordinance and Resolution thus barred coal at the terminal, even though the Agreement itself did not prevent it.

## III.  OBOT sues Oakland for breach of contract, and the district court rules against Oakland after a bench trial.

OBOT sued Oakland in December 2016, alleging that the City breached the Agreement, and that the Ordinance and Resolution violated the Commerce Clause and were preempted by federal law. Shortly after Oakland filed a motion to dismiss, Sierra Club and Baykeeper moved to intervene. The district court denied intervention of right, but granted permissive intervention limited to "defending against the developer's claims," which did "not include the right to bring counterclaims, the right to bring cross-claims, or the right to prevent the case from being dismissed on a stipulation between the developer and the City."

The court denied Oakland's and Intervenors' motions to dismiss. Following expedited discovery, the court denied the parties' cross-motions for summary judgment on the breach of contract claim. The court scheduled a bench trial, and took the constitutional and federal preemption claims under submission pending resolution of the breach of contract claim.

At trial, the court heard testimony from experts and other witnesses proffered by both sides. Following post-trial briefing, the court issued its findings of fact and conclusions of law. The court found that Oakland lacked substantial evidence that the proposed coal operations posed a substantial health or safety danger. As the court put it, the record is "riddled with inaccuracies, major evidentiary gaps,

erroneous assumptions, and faulty analyses, to the point that no reliable conclusion about health or safety dangers could be drawn from it." The court, as a result, determined that Oakland breached the Agreement when it passed the Resolution, and it declared the Resolution invalid.

## STANDARD OF REVIEW:

### Deference to the Trial Court or to the City?

Standard of review is pivotal to the outcome of this appeal: Should this court review this case as a breach of contract dispute in which we must give deference to the trial court's factual findings — or as an administrative law proceeding in which the City's health and safety findings are afforded deference?

Appellants contend that the district court erred by applying the traditional rules that govern a breach of contract case. According to Appellants, the district court should have instead adhered to administrative law review principles by limiting evidence to the record before the city council when it enacted the disputed Resolution and by giving special deference to the City's health and safety determinations. Appellants argue that this deferential standard of review is mandated both by the terms of the Agreement and as a matter of law. We disagree.

Section 3.4.2 of the Agreement provides that Oakland may apply a new regulation to OBOT only if the City determines, based on "substantial evidence," that the absence of the regulation will result in a condition substantially dangerous to health or safety. The district court found that "substantial evidence" refers only to the amount of evidence required to make a health and safety determination (*e.g.*, "substantial evidence" vs. "clear and

convincing evidence"). In contrast, Appellants assert that the parties, in using the phrase "substantial evidence," incorporated a *judicial standard of review* used in administrative law proceedings into Section 3.4.2. This interpretation of the Agreement is untenable for several reasons.

First, the plain language of Section 3.4.2 does not support Appellants' position. *See* Cal. Civ. Code § 1638 ("The language of a contract is to govern its interpretation, if the language is clear and explicit, and does not involve an absurdity."). It refers to "substantial evidence," not "substantial evidence review." Moreover, the provision states that "substantial evidence" must guide the *City's* determination to apply new regulations to OBOT. Nowhere in Section 3.4.2 does it state that "substantial evidence" is the standard of review that governs a *court's* determination of a claim of breach. And using the term "substantial evidence" to describe the quantum of evidence makes sense: The parties agree that "substantial evidence" has an established meaning under California law as evidence that is "reasonable in nature, credible, and of solid value." Put another way, the term "substantial evidence" in the Agreement means that the City must rely on evidence that is "reasonable in nature, credible, and of solid value" in determining whether (in this case) transportation of coal through the terminal poses a substantial danger to health or safety. It does not speak to the judicial standard of review.

Second, other parts of the Agreement show that, where the parties intended to impose parameters on litigation, they did so expressly. For example, Section 14.14 provides that any challenge to a "termination, modification, or amendment" of the Agreement must be by administrative mandamus under California Code of Civil Procedure Section

1094.5(c) — a statutory provision that invokes "substantial evidence" *judicial review*. *See* Cal. Code Civ. P. § 1094.5(c) ("Where it is claimed that the findings are not supported by the evidence, in cases in which the court is authorized by law to exercise its independent judgment on the evidence, abuse of discretion is established if the court determines that the findings are not supported by the weight of the evidence. In all other cases, abuse of discretion is established if the court determines that the findings are not supported by substantial evidence in the light of the whole record."). Section 14.14 also limits venue for such actions to the Superior Court of the County of Alameda. Section 3.4.2, in telling contrast, contains no language about the terms of potential litigation. *See Whittlestone, Inc. v. Handi-Craft Co.*, 618 F.3d 970, 975 n.2 (9th Cir. 2010) ("[T]he whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other.") (quoting Cal. Civ. Code § 1641).

And third, contracting parties cannot dictate to a federal court the standard of review that governs a case. *See Kyocera Corp. v. Prudential-Bache Trade Servs., Inc.*, 341 F.3d 987, 1000 (9th Cir. 2003) ("[P]rivate parties lack the power to dictate *how* the federal courts conduct the business of resolving disputes.") (citing *K & T Enters., Inc. v. Zurich Ins. Co.,* 97 F.3d 171, 175 (6th Cir. 1996) ("The parties, however, cannot determine this court's standard of review by agreement. Such a determination remains for this court to make for itself.") (other citations omitted). Thus, even if the parties intended to impose a "substantial evidence" standard of review under Section 3.4.2 — which the language of the Agreement does not support — they lacked the authority to do so. *See id.*

We next consider whether "substantial evidence" judicial review applies here as a matter of law. Because we are aware of no California Supreme Court case that addresses whether administrative law review principles apply to a breach of contract action challenging an administrative decision, we must predict how that court would decide this issue. *See Gravquick A/S v. Trimble Navigation Int'l Ltd.*, 323 F.3d 1219, 1222 (9th Cir. 2003) ("In the absence of a controlling California Supreme Court decision, the panel must predict how the California Supreme Court would decide the issue, using intermediate appellate court decisions, statutes, and decisions from other jurisdictions as interpretive aids.").

Two California Court of Appeal decisions provide useful guidance. In *Shaw v. Regents of University of California*, the defendant university contended that, because the plaintiff was challenging an administrative decision by a state agency, the trial court erred in performing "a straightforward contract analysis" rather than applying the deferential mandamus standard of review. 58 Cal. App. 4th 44, 51 (1997). The Court of Appeal rejected this argument, holding that because "mandamus is not an appropriate remedy for enforcing a contractual obligation against a public entity," the trial court "correctly applied contract principles in resolving the parties' [contract] dispute." *Id*. at 52.

Similarly, in *300 DeHaro Street Investors v. Department of Housing & Community Development*, the Court of Appeal reaffirmed that the deferential mandamus framework does not apply to a contract action. 161 Cal. App. 4th 1240 (2008). There, the plaintiff alleged that a state agency's denial of a requested rent adjustment breached a regulatory contract with the agency. *Id*. at 1243–48. Rejecting the agency's arguments, the court held that mandamus rules did

not apply because "plaintiff does not challenge a mere administrative decision, but an administrative decision concerning a provision of a contract to which the plaintiff and defendant were parties." *Id*. at 1254–57.

Our court previously confronted facts similar to those here in a case that applied Arizona law. In *Pure Wafer Inc. v. City of Prescott*, the plaintiff entered into a development agreement with the City of Prescott for the construction of a metal refinishing plant. 845 F.3d 943, 946 (9th Cir. 2017). The development agreement protected the plaintiff from future changes to certain city regulations, most pertinently permitting the discharge of up to 100 mg/L of fluoride. *Id*. at 947. When the city later passed an ordinance limiting companies to 16.3 mg/L of fluoride discharge, the plaintiff sued for breach of contract. *Id*. at 949–50. Following a judgment in favor of the plaintiff after a bench trial, we reviewed the trial court's findings of fact for clear error. *Id*. at 953–58. Notably, we did not apply administrative law standard of review principles and did not give deference to the city. *Id*.

Tellingly, all of the cases cited by Appellants discuss the prevailing standard of review in a mandamus (or similar) context, which is not at issue here. *See*, *e.g.*, *W. States Petroleum Assn. v. Superior Court*, 9 Cal. 4th 559, 564 (1995) ("We granted review to determine whether evidence not contained in the administrative record is admissible in a traditional mandamus action[.]"). The relevant issue here is whether that standard extends by law to the breach of contract context. Appellants offer no authority on this point, and provide no meaningful counter to the sensible delineation articulated in *Shaw* and *300 DeHaro Street Investors* between the judicial treatment of mandamus actions and contract disputes.

Moreover, showing deference to the government in this type of breach of contract dispute would unfairly tilt the scales towards the government. *See Tonkin Constr. Co. v. Cty. of Humboldt*, 188 Cal. App. 3d 828, 831–32 (1987) ("A contract between a governmental body and a private party is to be construed by the same rules which apply to the construction of contracts between private persons, and the public entity is bound in the same manner as an individual.") (citations omitted).

Indeed, deferring to a government agency's findings would effectively create an escape hatch for the government to walk away from contractual obligations if political winds shift or if it faces an unexpected public backlash against a deal negotiated with a private party. Through self-serving regulatory findings insulated by judicial deference, the government would stack the odds in its favor in any ensuing litigation. The house (of government) would always win, and private parties would be left to the whims of a regulatory roulette. *Cf. United States v. Winstar Corp.*, 518 U.S. 839, 895 (1996) ("[A]llowing the Government to avoid contractual liability merely by passing any 'regulatory statute' would flout the general principle that, 'when the [Government] enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals.'") (citation omitted). Such a rule would undermine California's public policy and statutory mandate that regulations should generally remain frozen after approval of a development project to avoid uncertainty that can "discourage investment in and commitment to comprehensive planning which would make maximum efficient utilization of resources." Cal. Gov. Code § 65864(a).

In light of these factors, and in the absence of contravening authority, we determine that the California Supreme Court would not apply administrative law review principles as a matter of law to a contract action challenging an administrative decision. The district court thus owed no deference to the City's factual determinations here and did not err in considering extra-record evidence beyond what was presented at the public hearings.[2]

Since this action was decided by bench trial, we review the district court's factual findings for clear error and its conclusions of law *de novo*. *See Navajo Nation v. U.S. Forest Serv.*, 535 F.3d 1058, 1067 (9th Cir. 2008). "[W]hen an appellate court reviews a district court's factual findings, the abuse-of-discretion and clearly erroneous standards are indistinguishable." *United States v. Hinkson*, 585 F.3d 1247, 1259 (9th Cir. 2009) (citation omitted). A district court abuses its discretion if "application of the correct legal

---

[2] The dissent suggests that the Agreement barred the district court from considering extra-record evidence for *any* purpose. No such blanket restriction exists in the Agreement. Rather, Section 3.4.2 focuses the breach of contract inquiry on whether the City relied on evidence that was "substantial," without limiting the tools a reviewing court may use to make that assessment.

The district court struck a proper balance by considering extra-record evidence, "to a limited extent," for the sole purpose of "shed[ding] light on the adequacy of the evidence that was actually before the City Council." In other words, it was strictly employed to evaluate the credibility of the record evidence, *not* to supplement the record with new information regarding the safety of OBOT's proposed coal operations. That careful balance was appropriate because the 160-page ESA expert report — which was the key scientific report relied upon by the City — was issued *one business day* before the City voted on the Ordinance, depriving OBOT of an adequate opportunity to respond to the ESA report's analysis and conclusions.

standard was (1) 'illogical,' (2) 'implausible,' or (3) without 'support in inferences that may be drawn from the facts in the record.'" *Id.* at 1262 (citation omitted).

## DISCUSSION

## I.  The District Court Did Not Clearly Err in Finding That Oakland Breached the Contract.

The sole issue presented by OBOT's breach of contract claim is whether Oakland enacted the Resolution, under Section 3.4.2 of the Agreement, based on "substantial evidence" of a condition "substantially dangerous" to the health or safety of OBOT's terminal users or adjacent neighbors.  The parties agree that the district court correctly defined "substantial evidence" as evidence that is "reasonable in nature, credible, and of solid value."

The district court found that Oakland lacked "substantial evidence" under Section 3.4.2 because the record it relied on was "riddled with inaccuracies, major evidentiary gaps, erroneous assumptions, and faulty analyses, to the point that no reliable conclusion about health or safety dangers could be drawn from it."  And because we are reviewing factual findings after a trial, we must give those findings substantial deference.  We cannot reverse merely because we would have reached a contrary conclusion based on the evidence. *See Minidoka Irrigation Dist. v. Dep't of Interior*, 406 F.3d 567, 572 (9th Cir. 2005).  Rather, we can reverse only if the district court's findings are clearly erroneous to the point of being illogical, implausible, or without support in inferences from the record.  *See Hinkson*, 585 F.3d at 1251.  In reviewing the trial record in its entirety, we determine that the district court's factual findings were not clearly erroneous.

## A. *State Emissions Standards*

The parties focus heavily on whether OBOT's coal operations would exceed California's "threshold of significance" of 10 tons per year of particulate matter 2.5 ("PM 2.5") emissions. Cal. Code Regs. tit. 17, § 70200. In layman's terms, the issue is whether the amount of dust from the transported coal would surpass state standards. Appellants rely on the City's ESA expert report, which concluded that the project would exceed California's standard by generating over 20 tons of PM 2.5 emissions annually: 6 tons from rail transport, 11.7 tons from staging, and 2.7 tons from terminal operations. The district court, however, plausibly found these emissions estimates to be unreliable based on five flaws in ESA's analysis.

### 1. *Covers and Surfactants*

The court determined it was a "big mistake" for ESA, Oakland's expert, not to consider OBOT's proposed control measures that would potentially mitigate the dust from the transported coal. Specifically, the court pointed to two measures that OBOT had committed to using: (i) rail car covers that envelop the transported coal; and (ii) chemical dust suppressants ("surfactants") to keep the coal intact during rail transport and staging. These steps would mitigate the coal dust that would otherwise flow into the air, according to OBOT. But ESA refused to consider these two mitigation measures in calculating estimated emissions from the coal.

Appellants offer two justifications for ESA's decision not to factor these controls into its emissions calculations. First, they contend there was no guarantee that OBOT would actually employ rail covers or surfactants. OBOT, however, had represented to the City in writing that it was prepared to

enter into a contract with Oakland that mandated the use of both covers and surfactants, with the penalty of a default being the termination of OBOT's ground lease.  This evidence provided the district court with a reasonable basis to conclude that the absence of a guarantee did not justify the wholesale disregard of these control measures in ESA's analysis.

Second, Appellants argue that no credible scientific evidence supports the efficacy of covers or surfactants.  The district court, however, reasoned that the "lack of existing data about the effectiveness of a new technology . . . is not enough to assume them away."  The record adequately supports this finding, particularly with respect to surfactants. In a study cited by ESA, the BNSF Railway Company concluded that surfactants generate a coal dust suppression rate of 75% to 93%.  ESA, however, dismissed the study based on certain data reporting deficiencies (*e.g.*, track gradient and weather conditions), coal type used, and the degradation of chemicals in transit.  But as the district court noted, given the magnitude of the potential impact of surfactants, ESA should have employed a reasonable estimate that accounted for its criticisms of the existing data. Simply downgrading a possible 75%–93% mitigation effect to 0% created a major flaw.  The court's refusal to accept ESA's rejection of the mitigation effect is precisely the kind of evidence weighing a trier of fact is supposed to do.

## 2.  *Coal Type and Threshold Friction Velocity*

The district court also determined that ESA selected the wrong coal type in its emissions calculation for the staging phase, which resulted in an incorrect "threshold friction velocity" being used as an input.  In less technical terms, some types of coal are "dustier" than others, and Oakland's expert selected the wrong (*i.e.*, dustier) coal in estimating the

emissions. The potential swing in the resulting emissions number — from 11.7 tons to 0.68 tons per year — could single-handedly have brought ESA's total emissions calculation within California's "threshold of significance" of 10 tons per year.

Sufficient evidence in the record supports the court's conclusion. OBOT's expert credibly testified that a different coal type from the one selected by ESA would have more closely resembled the coal that OBOT planned to transport. ESA's selection, in contrast, reflected coal that had "been crushed under heavy equipment, bulldozers, et cetera." Not surprisingly, such crushed coal emits much more dust than other types of coal. Appellants do not contend that this testimony was rebutted in the record, but instead argue that, in a battle of experts, the court should have deferred to the city's experts under a "substantial evidence" review akin to that used in administrative proceedings. Because "substantial evidence" judicial review does not apply here, Appellants' argument fails. We hold that the district court did not clearly err in finding that ESA erred in its selection of coal type. *See United States v. Elliott*, 322 F.3d 710, 715 (9th Cir. 2003) ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.") (citation omitted).

### 3. *Rate of Emission During Rail Transport*

The district court further criticized ESA's calculation of rail transport emissions because it assumed constant wind and train speeds for the entire trip between Utah and Oakland, rather than accounting for local conditions. OBOT's expert opined that factoring in local conditions would have reduced ESA's emissions estimates for rail transport from 6 tons to 0.1 tons per year. Appellants' only response to this is that one of its other experts (PHAP)

accounted for local wind and train speeds in its analysis. But this only further undermines the validity of ESA's emissions estimates, as it reinforces that ESA could and should have employed those variables. The court therefore did not clearly err in this finding.

### 4. *Best Available Control Technology for Terminal Operations*

The district court identified an apparent calculation error in ESA's emissions estimates for terminal operations. ESA's report acknowledges that this calculation should account for the use of best available control technology, which would reduce terminal emissions by up to 99% (or 2.43 tons annually). But ESA's own spreadsheets appear to indicate that, instead of using the reduced figure, ESA errantly applied the pre-reduction number.

Appellants do not attempt to explain this discrepancy. They contend instead that, notwithstanding the apparent inconsistency, the court should have deferred to ESA's calculations, and that even if this error occurred, it was relatively small in impact. As discussed above, the court owed no such deference to Oakland's experts. And while subtracting 2.43 tons per year would not by itself bring ESA's calculations down to a state-compliant level, it is not insignificant and has an incremental effect on ESA's credibility. Based on this record, it was not clear error for the court to conclude that ESA's calculation error for terminal operations further undermined the reliability of its overall analysis.

### 5. *Air District Authority to Regulate*

It is undisputed that ESA's calculations did not account for regulations that the Bay Area Air Quality Management

District might impose on OBOT. Appellants argue, however, that the record offers no evidence to suggest that the Air District would apply any meaningful emissions-reducing regulations to the terminal.

It was not unreasonable for the district court to conclude that ESA should have at least *considered* the potential impact of Air District regulation. In relative terms, we view this as a less significant critique of the ESA report. But in conjunction with the four other significant flaws in ESA's analysis, the record provides ample support for the district court to have plausibly concluded that ESA failed to present credible evidence that OBOT's proposed coal operations would exceed California's "threshold of significance" for PM 2.5 emissions.

## B. *State and National Air Quality Standards*

Appellants contend that the PHAP report shows that OBOT's proposed coal operations would also cause the PM 2.5 concentration in West Oakland to exceed the state and national Ambient Air Quality Standard of 12 micrograms per cubic meter ($\mu g/m^3$), averaged over three years. PHAP first extrapolated from an Air District study that found the current PM 2.5 concentration in West Oakland to be 11.5 $\mu g/m^3$. It then applied the findings of a separate study of coal-carrying rail cars near the Columbia River Gorge in Washington State, and concluded that the transport of coal for OBOT's operations would increase the PM 2.5 concentration in West Oakland between 0.25 and 0.625 $\mu g/m^3$ — bringing the resulting total near or above the state and national standard.[3]

---

[3] Appellants reference in passing the World Health Organization standard of 10 $\mu g/m^3$. But given that, according to PHAP, West Oakland

The district court found PHAP's analysis to be flawed because it carried over data and assumptions from a dissimilar situation. Specifically, in incorporating the Washington State study, PHAP did not sufficiently account for local conditions, controls, or the fact that the study assessed a "far dustier" type of coal. The court's overall assessment is plausible. Under PHAP's conclusion that the PM 2.5 concentration will increase by 0.25 to 0.625 $\mu g/m^3$, a majority of that range would keep West Oakland compliant with the state and national standard. It was therefore reasonable for the court to determine that PHAP's use of a "far dustier" type of coal in its calculation rendered it unreliable in showing a likely violation of the standard — particularly given, as discussed above, the significant potential impact of threshold friction velocity (which correlates to coal type) on the resulting emissions result.[4] *See Husain*, 316 F.3d at 839 (where evidence is "a close call," the district court, "as the trier of fact, was in the best position to determine which of two plausible explanations was correct").

---

already exceeds that figure, it is unclear how to assess a substantial danger in relation to the WHO standard (not to mention that both California and the EPA have implemented a different standard).

[4] Appellants also briefly reference reports that indicated OBOT's operations would cause daily exceedances of the national standard. The court did not clearly err in rejecting that evidence for failure to "meaningfully estimate" the number of exceedances that would result, given that the standard allows for seven exceedances per year. As the court noted, the expert reports are vague on this point, and do not engage in any meaningful analysis.

## C.  *Impact of Incremental Emissions*

The district court rejected Appellants' argument that *any* emission of coal particulate matter poses a substantial danger to health.   The court determined that this view renders meaningless the word "substantial," which the court assigned the dictionary definition of "considerable importance, size, or worth."  The court further reasoned that, because this definition is inherently relative, a contextual standard is needed to assess whether the "substantial" threshold has been crossed.

Appellants counter, based on jury instructions given at a products liability trial, that "substantial" should be defined as "real and not insignificant."   Operating under this definition, Appellants argue that there is substantial evidence of a real danger from any incremental increase of coal particulate emissions in West Oakland.  They also contend that the court improperly required a comparison to other sources of emissions in Oakland.

Under California law, "words of a contract are to be understood in their ordinary and popular sense, rather than according to their strict legal meaning; unless used by the parties in a technical sense, or unless a special meaning is given to them by usage, in which case the latter must be followed."  Cal. Civ. Code § 1644.  Unlike "substantial evidence," the phrase "substantially dangerous" has no special meaning in the civil context.[5]  This is underscored by

---

[5] In the criminal context, "substantial danger" is commonly defined as "a serious and well-founded risk."  *See*, *e.g.*, *People v. Superior Court (Ghilotti)*, 27 Cal. 4th 888, 895 (2002).  There is no indication that the parties intended to adopt the criminal law formulation of that phrase.  In any event, this definition is more similar to the one articulated by the district court than that urged by Appellants.

the fact that Appellants reached to a decades-old products liability jury instruction, which has not resurfaced in later cases.  Since there is no indication of any "technical sense" or "special meaning" in which the phrase was used, the district court was correct to adopt the ordinary dictionary definition.

Appellants misconstrue the district court's requirement of a baseline for comparison.  While the court did suggest comparisons to neighboring sources of emissions, these were simply illustrative examples of how Oakland could have identified credible evidence of a substantial danger.  Much as Appellants tied their other evidence to state and national regulatory standards, the court plausibly determined that some type of reasonable guidepost was needed to understand if a theorized danger was "substantial."

The portions of the expert reports that Appellants rely on are vague.  For example, Dr. Chafe's report opines that "[t]here is no safe level of exposure to fine coal dust particles," without offering a means of measuring whether the safety threat posed by OBOT's operations would be substantial.  ESA similarly — and unhelpfully — states that "[i]f baseline concentrations of particulate matter are high, then any contribution from coal dust and coal train engines is likely to cause health effects."  PHAP offers the more specific data point that a one microgram per cubic meter increase in PM 2.5 correlates to a 1.6% increase in cardiovascular disease mortality, but does not provide any meaningful alternative to the EPA benchmark at which a finding a substantial danger could reasonably be made.  Based on this record, the court did not clearly err in finding that the evidence Oakland relied on to show that any volume of coal emissions is harmful did not credibly establish a substantial danger.

**D.** *Risk of Coal Fire*

Appellants rely on four sources for their contention that substantial evidence showed that the risk of fire from OBOT's coal operations would pose a substantial danger: reports from ESA, Dr. Chafe, PHAP, and Dr. Fox. City OB at 59–61. The district court, however, found this evidence to be "speculation," contradicted by the record, and lacking consideration of the fire department's oversight. The record contains sufficient support for the court's findings such that they are not clearly erroneous.

The district court could have reasonably determined ESA's fire risk analysis to be unreliable based on evidence that its report was curated in a results-driven manner. Much of the fire risk section was written by ESA's subcontractor, Steve Radis. But the report conspicuously omits Mr. Radis' draft statement that "[m]ajor fires at coal terminals are not common or widespread," and instead notes only that "[m]ajor fires have occurred at terminals located in Los Angeles, Scotland, and Australia." The report's value in establishing substantial danger was further diminished by its admission that many of the fires that do occur are "related to specific coal compositions that are known to have a higher tendency for spontaneous combustion, such as Powder River Basin coal from Montana and Wyoming" (as opposed to the bituminous coal OBOT plans to transport).

Dr. Chafe opines that bituminous coal "is highly volatile" and thus "easier to set alight than anthracite with its low volatile matter content." But the National Fire Protection Association's rating of bituminous coal as a low fire risk casts doubt on Dr. Chafe's statements. This is, in fact, the very rating relied on by the fire department when responding to emergencies. The court's decision not to

credit Dr. Chafe's report as credible evidence of a fire risk was therefore plausible.  *See Elliott*, 322 F.3d at 715.

The vagueness of the other two reports' descriptions of fire risk undermines their probative value.  PHAP makes generalized statements, such as "[i]t is not uncommon for coal to self-heat and begin burning," "spontaneous combustion also is possible," and "[t]here is a non-negligible risk of explosion and/or fire."  But the report provides no means of estimating the likelihood of such an event, from which an assessment of the substantiality of danger could be made.  Similarly, Dr. Fox states that transporting coal in covered rail cars "could facilitate spontaneous combustion." Dr. Fox acknowledges that ventilated tops would reduce the risk, but then dismisses this mitigation factor based on the unsupported contention that ventilated tops are "too expensive."  Viewed in light of the record as a whole — in particular, considering contrary evidence of bituminous coal as a low fire risk and the completely ignored element of the fire department's oversight of OBOT's fire safety plan — the court did not clearly err in determining that these reports did not rise to the level of substantial evidence of a substantial danger.

## E.  *Other Expert Evidence in the Record*

Appellants contend that, in addition to the evidence discussed above, the record before Oakland when it passed the Resolution contained other, independently substantial evidence of a substantial danger.  This evidence, however, suffers from the same flaws that the district court plausibly identified in its findings of fact.

*Dr. Chafe Report*: Dr. Chafe extensively discusses the danger to health arising from coal dust exposure, but does so at a generalized level.  She does not estimate the emissions

that would be created by OBOT's proposed operations, nor the resulting impact on air quality for West Oakland or the terminal. And while the report contends there is "no safe level of exposure to fine coal dust particles," it provides no way to meaningfully assess whether a "substantial" danger would be created by OBOT. Similarly, while Dr. Chafe opines that bituminous coal is "highly volatile," she does not discuss the likelihood of an explosion or fire other than to state it is "non-negligible."

*Dr. Fox Report*: Dr. Fox warns that "about 18,200 tons/yr [of coal dust] could be released within the state." But she dismisses the mitigating impact of surfactants, despite acknowledging they can be at least 85% effective, on the basis that their use has "not been proposed by" OBOT — which is contradicted by the record. She also provides no calculation for the relevant West Oakland area. And her report offers no estimate of the particulate matter (as opposed to coal dust) that would be emitted, except to state generally that there would be "[i]ncreased emissions of diesel particulate matter."

*Sustainable Systems Report*: Sustainable Systems similarly dismisses surfactants and fails to provide any estimate of particulate matter emissions. Instead, like Dr. Fox, Sustainable Systems limits its calculations to coal dust generally. Notably, Oakland's expert ESA determined that Sustainable Systems used incorrect inputs in its calculations, and had to revise Sustainable Systems' coal dust estimates downward.

*Dr. Bart Ostro*: The substance of Dr. Ostro's testimony to the city council was entirely encompassed within the PHAP report, which we discussed above. Dr. Ostro, like PHAP, referenced the Washington State study to opine that OBOT's proposed operations would have a harmful impact

on the air quality of West Oakland.  Dr. Ostro made the same mistake of failing to account for the different coal type used in the Washington State study, and unlike PHAP did not even appear to factor in local wind or train speeds.  His testimony was therefore less reliable than PHAP's report, which the court plausibly found lacked credibility.

Based on this record, we determine that the district court did not clearly err in finding that Oakland lacked substantial evidence of a substantial danger to health or safety when it enacted the Resolution.

## F.  *California Government Code Section 65866*

Intervenors separately assert two alternative arguments, based on California Government Code Section 65866, that no breach occurred.  The district court correctly rejected the first argument and acted within its discretion in declining to reach the latter.

### 1.  *Interpretation of Section 3.4.2*

Section 3.4.2 provides that "City shall have the right to apply **City Regulations** adopted by City after the Adoption Date, if . . ." (emphasis added).  Intervenors contend that, unless the phrase "City Regulations" in the agreement is limited to land use regulations, Section 3.4.2 runs afoul of a limitation in Government Code Section 65866 that development agreements may freeze only land use regulations.  Intervenors thus urge that, to harmonize Section 3.4.2 with California law, "City Regulations" in the Agreement should be (re)defined as land use regulations.

Intervenors' proposed interpretation of Section 3.4.2 is inconsistent with the language of the Agreement as a whole. The Agreement expressly defines "City Regulations" as the

"General Plan of City, the Oakland Army Base Redevelopment Plan (as amended prior to the Adoption Date), Oakland Army Base Reuse Plan (as amended prior to the Adoption Date), and **all other ordinances, resolutions, codes, rules, regulations and policies** in effect as of the time in question." (emphasis added). Not in Section 3.4.2, the definitions section, or anywhere else in the Agreement does the phrase "City Regulations" distinguish between land use and non-land use regulations.

While California law states that a "contract must receive such an interpretation as will make it lawful," this mandate applies only "if it can be done without violating the intention of the parties." Cal. Civ. Code § 1643. The plain language of the Agreement manifests a clear intent by the parties for Section 3.4.2 to freeze *all* existing regulations, not just land use regulations. In addition, as the district court aptly noted, Oakland expressly invoked Section 3.4.2 in enacting the Resolution, putting to rest any possible ambiguity as to intent.

### 2. *Validity of Section 3.4.2*

The district court declined to consider Intervenors' argument that, to the extent Section 3.4.2 applies to non-land use regulations, it is invalid because it conflicts with Government Code Section 65866. The court determined this argument to be outside the scope of Intervenors' permissive intervention, which was limited to "defending against the developer's claims and will not include the right to bring counterclaims [or] cross-claims."

Under Federal Rule of Civil Procedure 24(b), the district court's authority "to grant or deny an application for permissive intervention includes discretion to limit intervention to particular issues." *Dep't of Fair Employment*

*& Hous. v. Lucent Techs., Inc.*, 642 F.3d 728, 741 (9th Cir. 2011) (citations omitted). We review limitations imposed on permissive intervention for abuse of discretion. *See id.* at 742.

Intervenors contend they are permitted to argue for the invalidity of the Agreement within the terms of their limited scope of intervention because this is a defense to OBOT's breach of contract claim. Intervenors' attempt to void the Agreement, however, can be construed as an affirmative cross-claim against Oakland for unconstitutionally contracting away its police powers. *See Hollywood Park Land Co., LLC v. Golden State Transp. Fin. Corp.*, 178 Cal. App. 4th 924, 946 (2009). Given the wide latitude that Rule 24(b) grants in dictating the terms of permissive intervention, the district court did not abuse its discretion in determining Intervenors' argument to be outside their permitted scope of intervention. *See Lucent Techs.*, 642 F.3d at 741 (citing *Columbus–Am. Discovery Grp. v. Atl. Mut. Ins. Co.,* 974 F.2d 450, 469 (4th Cir. 1992) ("When granting an application for permissive intervention, a federal district court is able to impose almost any condition.")).

## II. The District Court Did Not Abuse Its Discretion in Denying Intervention of Right.

Intervenors argue that the district court erred in failing to grant intervention of right in this action. We disagree.

Federal Rule of Civil Procedure 24(a)(2) entitles intervention of right when an applicant: (i) timely moves to intervene; (ii) has a significantly protectable interest related to the subject of the action; (iii) may have that interest impaired by the disposition of the action; and (iv) will not be adequately represented by existing parties. Fed. R. Civ. Pro. 24(a)(2); *Prete v. Bradbury*, 438 F.3d 949, 954 (9th Cir.

2006) (citation omitted).  We review *de novo* the district court's denial of intervention of right.  *United States v. Alisal Water Corp.*, 370 F.3d 915, 918 (9th Cir. 2004).

Adequacy of representation is the sole element at issue here.  To establish inadequate representation, Intervenors needed to make a "very compelling showing" because: (1) a governmental entity (Oakland) was already acting on behalf of their interests in this action: and (2) Intervenors and Oakland share the same ultimate objective of upholding the Ordinance and Resolution.  *See Arakaki v. Cayetano*, 324 F.3d 1078, 1086 (9th Cir. 2003) (a "very compelling showing" is required to rebut a "presumption of adequacy" when "the government is acting on behalf of a constituency it represents" or when the applicant and existing party "have the same ultimate objective").

None of Intervenors' four arguments satisfy this heightened threshold.  First, Intervenors contend that their narrower interest — a focus on health, safety and environmental protections, as opposed to Oakland's broader concerns that include such matters as the City's finances and its contractual relationship with OBOT — rebuts the presumption of adequacy.  But this alone is insufficient.  *See Prete*, 438 F.3d at 957–58 (applicant must proffer sufficient "evidence" to show that government will take undesirable legal position).  Intervenors failed to offer persuasive evidence, at the time of their motion to intervene, that Oakland's broader interests would lead it to stake out an undesirable legal position.  The presumption of adequacy thus remained intact.

Second, Intervenors argue that Oakland was neither positioned nor willing to make all of Intervenors' arguments. Intervenors identify two such arguments.  They point initially to the fact that Intervenors moved to dismiss

OBOT's Commerce Clause claim, while Oakland did not. But Oakland later incorporated Intervenors' Commerce Clause arguments at the summary judgment stage, conclusively establishing its willingness and ability to take that position.  Intervenors also reference Oakland's decision not to join their post-trial argument attacking the validity of the Agreement.  Intervenors, however, failed to identify this potential argument at the time of their motion, and may not do so for the first time after trial.  *See Janes v. Wal-Mart Stores Inc.*, 279 F.3d 883, 887 (9th Cir. 2002).

Third, Intervenors assert that their prior lawsuit seeking to compel Oakland to perform a CEQA environmental review of a potential coal terminal rebuts the presumption of adequacy.  This ground for intervention, however, applies when an issue in the earlier litigation is also the reciprocal subject of the action in which the applicant seeks to intervene.  *See*, *e.g.*, *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1398 (9th Cir. 1995) (environmental groups granted intervention because the challenged agency rule was promulgated only as a result of the groups' earlier lawsuit against the agency).  Whether Oakland needs to engage in a CEQA review is irrelevant to the issues in this case, and therefore has no bearing on adequacy of representation.

Finally, Intervenors state that their expertise in environmental issues warrants intervention of right.  We rejected a similar argument in *Prete*.  438 F.3d at 958–59 (specialized knowledge insufficient absent evidentiary showing that government could not obtain that knowledge through discovery or experts).  Because Intervenors cannot show that Oakland was unable to acquire the requisite specialized knowledge to represent Intervenors' interests, they cannot rebut the presumption of adequacy.

\* \* \* \* \*

In affirming, we do not opine on the ultimate issue of any alleged health or safety impact of OBOT's proposed plan. Nor do we judge the economic or environmental merits of the Agreement to develop a commercial terminal that may house and transport coal. Rather, we affirm, under a clearly erroneous standard of review, the district court's bench trial ruling that Oakland breached the Agreement.

**AFFIRMED.**

PIERSOL, District Judge, dissenting:

I respectfully dissent.

## I.  Background

### A.  The Development Agreement

After Congress closed the Oakland Army Base, the City of Oakland initiated redevelopment planning. In 2012, the City revised its redevelopment plan for the 34 acres ("the Project Site") with that analysis never considering the possibility of coal at the terminal. In fact, in December 2013, Phil Tagami, an OBOT principal, assured community members that coal was *not* part of the redevelopment plan. In a newsletter, he stated that "It has come to my attention that there are community concerns about a purported plan to develop a coal plant or coal distribution facility . . . . This is simply untrue." In July 2013, the City and OBOT's predecessor-in-interest signed a "Development Agreement" formalizing its right to develop the Project Site into "a ship-to-rail terminal designed for the export of non-containerized bulk goods and import of oversized or overweight cargo."

The Development Agreement did not mention coal or any specific commodity.

The Development Agreement was adopted pursuant to the Development Agreement Legislation which permits a city or county to "enter into a development agreement" with any property owner "for the development of the property." Cal. Gov't Code § 65865. The statute "allows a city or county to freeze zoning and other land use regulation applicable to specified property to guarantee that a developer will not be affected by changes in the standards for government approval during the period of development." *Santa Margarita Area Residents Together v. San Luis Obispo Cty.*, 84 Cal. App. 4th 221, 226–27 (Cal. Ct. App. 2000). Under the words of the statute,

> Unless otherwise provided by the development agreement, rules, regulations, and official policies governing permitted uses of the land, governing density, and governing design, improvement, and construction standards and specifications, applicable to the development of the property subject to the development agreement, shall be those rules, regulations, and official policies in force at the time of execution of the agreement. A development agreement shall not prevent a city . . . from applying new rules, regulations and policies which do not conflict with those rules, regulations, and policies applicable to the property as set forth herein. . . .

Cal. Gov't Code § 65866(a).

The Development Agreement that was executed by OBOT's predecessor-in-interest froze in place local land use

regulations that existed at the time the Development Agreement was signed. An exception to the regulations freeze was provided in Section 3.4.2 of the Development Agreement which specifies that the City:

> [S]hall have the right to apply City Regulations adopted by [the] City after the Adoption Date [of the Development Agreement], if such application (a) is otherwise permissible pursuant to Laws (other than the Development Agreement Legislation), and (b) [the] City determines based on substantial evidence and after a public hearing that a failure to do so would place existing or future occupants or users of the Project, adjacent neighbors, or any portion thereof, or all of them, in a condition substantially dangerous to their health or safety.

Development Agreement 3.4.2.

## B. Public Input

After it became clear in April 2015 that the terminal was going to be devoted to the storage, handling and loading of coal, the City announced a public hearing, the first step in a nearly year-long public process to assess the health and safety consequences of handling and storing coal at the terminal. Before the September 21, 2015, public hearing, OBOT submitted to the City a "Basis of Design" describing the basic framework for the terminal, and submitted a report by HDR Engineering claiming that coal dust pollution from coal-filled rail cars and terminal operations would be "negligible." Intervenors submitted expert reports prepared by Dr. Phyllis Fox and Sustainable Systems Research, LLC.

The Fox report identified flaws in the HDR report proffered by OBOT and concluded that the terminal would cause adverse health and environmental impacts. The Sustainable Systems Research report estimated potential air emissions from coal-filled rail cars waiting to be unloaded, finding they would emit hundreds of tons of coal dust annually.

Nearly 600 people requested to speak at the hearing. Many, including prominent health and air pollution experts, testified that a coal terminal would endanger nearby residents of West Oakland. Dr. Muntu Davis, Public Health Director of Alameda County, testified that West Oakland already "had lots of sources of pollution" and that the residents there had "poor health outcomes" and existing "issues with air quality." Likewise, Dr. Bart Ostro, former chief of the air pollution epidemiology section for the California EPA and author of over 100 peer-reviewed studies on the health effects of air pollution, foresaw "significant increases in coal dust" and stated that those increases would "affect the public health of the people of Oakland." A local dockworker—formerly a nurse— explained that she stopped accepting coal trans-loading jobs at the Port of Stockton because of the negative impacts of coal dust on her health.

At the hearing's conclusion, the City Council voted unanimously to solicit additional public comments, requested more evidence from stakeholders, and instructed City staff to review and summarize the evidence submitted. City staff subsequently sent follow-up questions to interested parties and, in October 2015, received responses from OBOT, labor organizations, environmental groups including Intervenors, the Alameda County Public Health Department, the Bay Area Quality Management District, the U.S. EPA, and the East Bay Regional Park District.

In early 2016, the City negotiated a contract with the consulting firm Environmental Science Associates ("ESA") to analyze the health and safety impacts of storing and handling coal in West Oakland. The City Council approved the ESA contract on May 3, 2016. ESA issued its report on June 23, 2016.

Contemporaneous with the City Council retaining ESA, Councilmember Dan Kalb commissioned Dr. Zoë Chafe, Ph.D., MPH, to analyze and summarize findings on the potential health impacts and safety risks posed by OBOT's proposed terminal. Dr. Chafe issued her report on June 22, 2016.

The City accepted additional comments in June 2016, including a detailed report by the Public Health Advisory Panel, a coalition of prominent Bay Area physicians and public health experts. Fifteen other physicians, scientists, and public health professionals endorsed the Panel report. The Director of the Alameda County Public Health Department also concurred with the Panel's conclusions.

## C. Health and Safety Impacts on West Oakland Residents

On June 24, 2016, City staff published a detailed agenda report that analyzed the public comments received during months of public review. The report recommended that the City Council adopt an ordinance to prohibit storage and handling of coal at bulk material facilities and terminals in Oakland, and a resolution applying the ordinance to the Project Site. The agenda report described and attached the ESA report. It also discussed the Chafe report, the Public Health Advisory Panel report, and other evidence submitted to the City—including OBOT's Basis of Design.

All three major reports agreed that terminal activities would generate fugitive coal dust. The dust would include significant amounts of the harmful and sometimes deadly air pollutant $PM_{2.5}$. Further, the Chafe and Public Health Advisory Panel reports found that coal dust emissions would contain toxic components like mercury and arsenic. All three reports discussed the enhanced risks of fire or explosion at OBOT's proposed terminal, given coal's potential to spontaneously combust. Finally, the three reports warned that these health and safety risks were even more consequential because of the terminal's proximity to West Oakland—where residents were already disproportionately burdened with high levels of pollution, elevated cancer risks, poor birth outcomes, frequent emergency room visits for asthmatic children, and shorter lifespans. A study cited by the agenda report found that individuals born in West Oakland have a life expectancy that is 15 years less than individuals born in the more affluent neighborhoods within Oakland Hills.

## D.  Adoption of Ordinance and Resolution

On June 27, 2016, after a final public hearing, the City Council unanimously enacted Ordinance No. 13385 ("Ordinance"), which states that owners and operators of a "Coal or Coke Bulk Material Facility shall not . . . Store or Handle any Coal or Coke." The Council also unanimously approved Resolution No. 86234 which applied the Ordinance to OBOT. The City Council found, "based on substantial evidence in the record," that failing to apply the Ordinance to OBOT would result "in a condition substantially dangerous" to the "health and/or safety" of nearby community members.

### E.  OBOT Files Lawsuit

OBOT filed a lawsuit against the City in federal court for a claimed breach of contract.  It alleged that the City violated Sections 3.4.1 and 3.4.2 of the Development Agreement when it applied the new Ordinance to the Project Site. OBOT alleged that the City breached the Development Agreement because the City's determination was not based on "substantial evidence" that the handling and storage of coal at bulk material facilities within the City posed a substantially dangerous threat to the health or safety of community members.

The district court denied the parties' cross-motions for summary judgment and scheduled a bench trial on the breach of contract claim to assess whether there was "substantial evidence" in the record before the City supporting its determination.  The district court conducted a three-day bench trial beginning on January 16, 2018.  At trial, OBOT was permitted to present lengthy extra-record testimony from three experts.  These experts not only offered critiques of the City's methods, evidence, and conclusions, but were also allowed to address the relevance and significance of new extra-record exhibits.  Before, during, and after trial, the City objected to the district court admitting and considering extra-record evidence introduced by OBOT at trial.  The City argued that this evidence would enable OBOT to improperly contradict the City's administrative record with information that the Council had no opportunity to review.  The City raised this issue in its pre-trial brief, its pre-trial objection, lodged a continuing objection at the outset of trial, and renewed the objection after trial.

On May 15, 2018, the district court issued Findings of Fact and Conclusions of Law.  The court invalidated the Resolution as a breach of the Development Agreement,

concluding that "the record before the City Council [did] not contain enough evidence to support the City Council's conclusion that the proposed coal operations would pose a substantial danger to people in Oakland." Although the court acknowledged that the City's decision "may only be justified on the basis of evidence that was before the City Council at the time the decision was made," it significantly relied on extra-record evidence produced by OBOT in rendering its decision. The court's opinion focused on OBOT's critiques of the ESA report and largely did not address other evidence amassed and reviewed by the City.

## II.  Analysis

Section 3.4.2 of the Development Agreement allowed the City to apply new land use regulations[1] to the Project site if the "City determines based on substantial evidence and after a public hearing" that failure to do so would pose a substantially dangerous threat to the health and safety of residents. The Development Agreement itself limits the consideration of what is substantial evidence to what evidence came before the City before it adopted the Ordinance.

Instead of the trial court's review of the City's determination being based on the evidence before the City in its public proceedings, the trial court allowed OBOT to present a variety of experts to contradict and otherwise point out flaws in the evidence that was put before the City. In addition to holding public hearings, the City considered

---

[1] The Ordinance at issue in this case concerns the health and safety impacts of a particular land use—the storage and handling of coal in bulk materials facilities within the City. Virtually all the evidence before the City Council and the court dealt with health and safety issues.

evidence submitted by community members and experts on this issue. There was every opportunity for OBOT to present its own experts in the proceeding as others had done throughout the City's almost year-long review. OBOT contends that it did not have a time to respond to the ESA report in particular, but OBOT never sought to do so, nor requested that it be allotted more time to respond. Instead, OBOT sued the City for breach of contract in federal court.

This case is styled as a breach of contract action. Section 3.4.2 of the Development Agreement (the contract in this case) circumscribes what evidence is to be considered by the district court in determining whether the City was in breach of the Agreement. Per its terms, whether the City breached the Development Agreement depends on whether there was substantial evidence before the City in its proceedings regarding the Ordinance and Resolution.

Circumscribing by contract the evidence to be considered by the trial court renders this case analytically similar to an appeal challenging an administrative determination. There are limited exceptions allowing extra-record evidence in an administrative appeal. *See Fence Creek Cattle Co. v. U.S. Forest* Service, 602 F.3d 1125, 1131 (9th Cir. 2010). Those exceptions do not apply in this case given the language of the Development Agreement limiting the district court's review to that before the City.

Even if any administrative appeal exceptions to the consideration of extra-record evidence were to apply, none would be applicable here. In a mandamus action challenging air quality regulations, the California Supreme Court upheld a trial court's decision limiting evidence to the administrative record. *W. States Petroleum Ass'n v. Superior Crt.*, 9 Cal. 4th 559, 579 (Cal. 1995). Much like OBOT in this case, the plaintiff in *Western States Petroleum*

*Association* sought to introduce extra-record evidence to show that the administrative agency had not considered "all relevant factors" in rendering its decision and to question the accuracy of the evidence relied upon by the agency. *Id.* at 577. The California Supreme Court rejected the plaintiff's arguments, stating that they were "nothing more than a thinly veiled attempt to introduce conflicting expert testimony to question the wisdom and scientific accuracy of the [agency's] decision." *Id.* at 578. The California Supreme Court concluded that "extra-record evidence can never be admitted merely to contradict the evidence the administrative agency relied on in making a quasi-legislative decision or to raise a question regarding the wisdom of that decision." *Id.* at 579.

In the present case, it was error for the trial court to admit and consider evidence pertaining to the health and safety effects of coal handling and storage upon nearby residents that was not submitted to the City. To allow otherwise subverts the public proceedings of governmental entities and makes their hearings a mere warm-up for when the heavy artillery is brought out in a trial.[2] In the present case, once

---

[2] The district court recognized, at least in theory, that even in this breach of contract action, the "substantial evidence" standard is "deferential" to the City. In its opinion, the district court stated that it must confine its review to "whether the record before the City contained substantial evidence that the proposed coal operations would pose a substantial danger to health and safety" and may not substitute its own determination for that of the City's. Where the district court erred was when it admitted extra-record evidence to supplement and contradict the evidence that was before the City in rendering its decision.

The majority opinion does away with any deference to the City's determination. Because this action is styled as a breach of contract action, the majority concludes that the "district court [ ] owed no deference to the City's factual determinations [ ] and did not err in

such evidence was allowed to be introduced, the trial court became a factfinder on various subjects of conflicting expert testimony.  The Development Agreement did not provide for, nor does it allow the presentation of such evidence. Based on the entire record before the City, "a reasonable mind might accept as adequate," *see Braewood Convalescent Hosp. v. Workers' Comp. Appeals Bd.*, 34 Cal. 3d 159, 164 (Cal. 1983), the City's conclusion that coal handling and storage at the terminal would pose a substantially dangerous threat to the health and safety to community members.  Accordingly, I would reverse the district court's judgment and remand.

_____

considering extra-record evidence beyond what was presented at the public hearings."  Whether an action is styled as a breach of contract action, a mandamus action, a declaratory action, or an administrative appeal, the majority's conclusion allows OBOT (or any other party to a development agreement) to contest (using evidence that could have been submitted to the City, but was not) the applicability of a government regulation that was passed after the City conducted public hearings and took evidence.  Under such precedent, there is little incentive for a party to a development agreement to participate, other than nominally, in the public proceedings.  It may as well, as OBOT largely did, wait and sue the City in federal court for a breach of contract and litigate *de novo*, evidence of health and safety effects which should have been offered in the public proceedings.